# INTERNATIONAL CHAMBER OF COMMERCE

# INTERNATIONAL COURT OF ARBITRATION

## Case n°14403/FM

Partial Award

<u>Partial Award</u>
<u>in the ICC Arbitration n°14403/FM</u>
<u>between:</u>

<u>A) Claimants:</u>

- GE Transportation S.p.A., a corporation organized and existing under the laws of Italy, having its registered offices at Via P. Fanfani 21, 50127, Florence, Italy;

  (hereinafter "GE"),

- Athena S.A., a company organized and existing under the laws of Greece, having its registered offices at 357-359 Av. Messogion, 15231, Athens, Greece;

  (hereinafter "Athena"),

Acting together as sole members of Iliria Consortium, an unincorporated association formed under the laws of Italy.

  (hereinafter jointly referred to as "Iliria", or "the Claimants")

Whose Counsel is M. Michael McIlwrath and M. Roberto Calabresi, GE Infrastructure Europe, Via Felice Matteucci 2, 50127 Florence, Italy (Tel: + 39.055.423.84.45; Fax: + 39.055.423.29.60), and M. Pericles A. Stroubos, Stroubos & Associates, 48, Patriachou Ieremiou St., 11475, Athens, Greece.

<u>B) Respondent:</u>

- The Ministry of Public Works, Transport and Telecommunications of the Republic of Albania, having its offices at Sheshi "Skenderbej" n°5, Tirana, Albania, through the State Attorney's Office;

  (hereinafter "The Ministry", or "the Respondent")

Whose Counsel is Mrs Ledina Mandia, Consultant, Republika E Shqipërisë E Shtetit, Bulevardi "Deshmoret e Kombit" prane Hotel "Dajti", Tirana, Albania (Tel: + 355.4.253.544; Fax: + 355.4.253.544), and M. Simone Caruso, Tonucci & Partners, Via Principessa Clotilde, 7, 00196 Rome, Italy.

2

**INDEX**

| | | | |
|---|---|---|---|
| I. | **The Arbitration Agreement** | page | 4 |
| II. | **The Bifurcation of the Proceedings** | page | 5 |
| III. | **The Prayers for Relief** | page | 5 |
| | A) | Claimants' Prayers for Relief | page | 5 |
| | B) | Respondent's Prayers for Relief | page | 6 |
| IV. | **The Applicable Law** | page | 7 |
| V. | **The Place of the Arbitration** | page | 7 |
| VI. | **The Language of the Arbitration** | page | 7 |
| VII. | **The Arbitral Tribunal** | page | 7 |
| VIII. | **Documents Submitted by the Parties prior to the Signature of the Terms of Reference** | page | 8 |
| | A) | Submitted by Claimants | page | 8 |
| | B) | Submitted by Respondent | page | 8 |
| IX. | **The Terms of Reference** | page | 8 |
| X. | **The Arbitral Proceedings after the Signature of the Terms of Reference** | page | 10 |
| XI. | **The Facts** | page | 15 |
| XII. | **Main Relevant Contractual Provisions** | page | 32 |
| XIII. | **Summary of the Parties' Positions** | page | 35 |
| | A) | Claimants' Position | page | 35 |
| | B) | Respondent's Position | page | 36 |
| XIV. | **Legal Analysis** | page | 38 |
| | A) | Respondent's Objection on Jurisdiction | page | 38 |
| | B) | Athena's *Jus Standi* in the Arbitration | page | 43 |
| | C) | The Contract's Validity | page | 43 |
| | | 1. Admissibility of the Invalidity Defence | page | 44 |
| | | 2. Title of Albanian law to be Applied | page | 48 |
| | D) | Respondent's Purported Liability under Article 1358 of the Italian Civil Code | page | 50 |
| | | 1. Applicability of Article 1358 of the Italian Civil Code | page | 51 |
| | | 2. Respondent's Purported Liability | page | 53 |
| | | a) Respondent's Actions/Omissions in respect to the condition | page | 55 |
| | | b) Content of the Requirement of Good Faith set by Article 1358 | page | 56 |
| | | c) Is Respondent Released of its Responsibility by Albanian Laws? | page | 58 |
| | E) | Nature and Extent of Respondent's Liability | page | 59 |
| | F) | Purported Liability on other Legal Grounds, such as the Notice to Proceed or the Purported Breach of the Representation and Warranties | page | 61 |
| | G) | The Parties' Legal Costs | page | 62 |
| **Conclusion** | | | page | 63 |

## I. The Arbitration Agreement:

1. This dispute arises from a contract executed between the parties on 15 September 2003 (hereinafter "the Contract") for the modernisation of the "Tirana-Durres" and Rinas Airport railway sections (Exhibit C-1). Article 30-2 of the Contract's Conditions provides as follows:

> "Any dispute regarding the Contract submitted by either party to arbitration shall be settled by a board of arbitrators composed of three (3) members. Each party shall designate an arbitrator, the plaintiff in the request for arbitration and the defendant in the reply to the request. The third arbitrator, who shall be the chairman of the board, shall be appointed by the two arbitrators appointed by the parties. Should the defendant fail to designate its arbitrator within 20 (twenty) days from the appointment of the plaintiff's arbitrator, or should the arbitrators appointed by the Parties fail to reach an agreement on the designation of the third arbitrator within 20 (twenty) days from the appointment of the defendant's arbitrator, then the defendant's arbitrator, and/or the third arbitrator, as the case may be, shall be designated according to the Rules of the International Chamber of Commerce. The arbitration shall take place in Rome, Italy and shall be carried out in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce".

2. Pursuant to said clause and to Article VI of the terms of reference executed by the parties and the Arbitral Tribunal on 8 December 2006 (hereinafter "the Terms of Reference"), the parties accepted to submit to arbitration under the ICC Rules of International Arbitration (hereinafter "the Rules").

3. Article VI of the Terms of Reference further provides that the parties "*do not dispute the jurisdiction of the Arbitral Tribunal*". Nevertheless, in its Submission n°1 (page 33), Respondent asked the Arbitral Tribunal to "*decide that it is not competent and/or does not have jurisdiction to deal with the issues set forth in the above section*". In its Submission n°2 (page 3), Respondent argues that "*this Tribunal has no jurisdiction over such issues as the determination of whether there is a contract,*

4

*whether the public laws of Albania have been violated, whether the constitutional process has been respected, and whether the law on Public Procurement has been violated. Respondent asks the Tribunal to declare itself incompetent to decide on the Legal Issues 1, 2 and 3 filed in the Respondent's First Submission".* Respondent's objection on jurisdiction will be dealt with hereinafter.

## II. The Bifurcation of the Proceedings:

4. Pursuant to Article II. A. §1 of the Arbitral Tribunal's Procedural Order n°1, the proceedings have been bifurcated, the first phase of the proceedings relating to the purported liability of the Respondent, and the second to the assessment of damages.

## III. The Prayers for Relief:

5. The parties' Prayers for Relief are, in the last state of their written submissions, the following:

### A) Claimants' Prayers for Relief:

6. In its Submission n°1 dated 15 December 2006, Claimants requested the Arbitral Tribunal to issue a partial award on the question of the Respondent's liability as follows:

> a) Determining that Respondent has defaulted on its obligations and thereby become liable to Claimants for all costs and expenses incurred in the execution of the Contract, and any and all damages, including loss of profit, suffered as consequence of the default, as well as reasonable interest thereon and currency appreciation ("rivalutazione monetaria"), leaving the quantification of all such damages to a subsequent award;
>
> b) Determining, in the alternative event that the Tribunal accepts Respondent's defense that the contractual documents violated Albanian law, that Respondent is liable to Claimants for breach of contractual representations and warranties, and that Respondent has thereby become liable to Claimants for all costs and expenses incurred in the execution of the Contract, and any and all damages, including loss of profit, suffered as consequence of the default, as well as reasonable interest thereon and currency appreciation ("*rivalutazione*

*monetaria*"), and any other damages available at law, leaving the quantification of all such damages to a subsequent award;

c) In any event, determining that the Contract is effective with particular reference to the design, engineering and manufacturing activities referred to in the Notice to Proceed dated December 3, 2003 and declare that Respondent is bound to compensate Claimants for all damages, including costs and expenses, incurred and any expected profit thereon, arising before Claimants informed Respondent of its intention to terminate the Contract due to the Respondent's default, leaving the quantification of all such damages to a subsequent award;

d) Determining that Respondent is liable for all costs incurred by Claimants in connection with the determination of Respondent's liability, including the reasonable value of its employees engaged in prosecuting this arbitration claim, and any and all arbitration fees, plus reasonable interest thereon, leaving the quantification of all such damages to a subsequent award, and;

e) Awarding Claimants any other relief the Tribunal deems appropriate under the circumstances.

<u>B) Respondent's Prayers for Relief:</u>

7. Respondent has challenged the Arbitral Tribunal's jurisdiction for the reasons which have been recalled above.

8. In addition, Respondent has requested, in its Submission n°1 dated 30 January 2007, the following relief:

a) To rule that there is no effective contract, and that Respondent has no obligation whatsoever to perform under it;

b) To rule that Respondent is not obliged to compensate Claimants for anything;

c) To order Claimants to pay all costs of the arbitration, including the expenses incurred by the government of Albania, its defence team, its working group and administrative expenses, all legal and arbitration fees, plus interests; and

d) To determine that this arbitration process has damaged Albania's standing as an attractive country for investors, and to award Respondent any relief appropriate under the circumstances to compensate the damage done to the

credibility and standing of Albania in the eyes of serious international investors at a moment when the government of Albania is making huge efforts and creating new perspectives and opportunities for such companies to come and invest in the country.

## IV. The Applicable Law:

9. Article 31 of the Contract's Conditions provides that: *"The law which is to apply to the Contract and under which the Contract is to be construed shall be the substantive law of Italy"*.

10. Pursuant to Article VIII of the Terms of Reference, the parties *"agree that their dispute shall be resolved according to Italian law"*. Nevertheless, in its Submissions n°1 (pages 28 and 46) and n°2 (page 3), Respondent argued that the Contract should be held invalid because in violation of Albania's Law on Public Procurement and Code of Administrative Procedures.

## V. The place of the Arbitration:

11. Pursuant to Article 30-2 of the Contract's Conditions and to Article VII of the Terms of Reference, the place of the arbitration is Rome (Italy).

## VI. The language of the Arbitration:

12. Pursuant to Article 30-2 of the Contract's Conditions and to Article XI (b) of the Terms of Reference, the language of the arbitration is the English language.

## VII. The Arbitral Tribunal:

13. On 1 September 2006, the ICC International Court of Arbitration (hereinafter "the Court") confirmed Prof. Giorgio Bernini as co-arbitrator upon the joint nomination of the Claimants, and M. Naim Isufi as co-arbitrator upon the nomination of the Respondent.

On 25 October 2006, the Secretary General of the Court, in accordance with Article 9 (2) of the Rules, confirmed M. Alexis Mourre as Chairman of the Arbitral Tribunal, upon joint nomination of the co-arbitrators.

## VIII. Documents Submitted by the Parties prior to the Signature of the Terms of Reference:

14. Prior to the signature of the present Terms of Reference, the Arbitral Tribunal received the following documents, in original or copies:

### A) Submitted by Claimants:

- Request for arbitration dated 1 June 2006 (hereinafter "the Request"), with Exhibits numbered C.1 to C.36.

### B) Submitted by Respondent:

- Answer to the Request for arbitration dated 8 August 2006 (hereinafter "the Answer").

## IX. The Terms of Reference:

15. On 8 December 2006, pursuant to Article 18 of the Rules, the parties and the Arbitral Tribunal executed the Terms of Reference. The Terms of Reference include, in its Article V, the following Prayers for Relief:

*"a) Claimants ask the Tribunal to award the following relief:*

- *Reject the additional defenses and counterclaim communicated by Respondent via e-mail on November 16 and 17, 2006 as having been submitted impermissibly late under Rule 5 of the ICC Rules of Arbitration (and specifically beyond the time limit extended by the Secretariat at the request of Respondent);*

- *Ascertain that the Contract is effective and declare that Respondent is bound to perform under it;*

- *In the first alternative, in the event Respondent persists in its refusal to perform under the Contract, order Respondent to pay Claimants Iliria Consortium Euro 15,822,021, as an amount inclusive of the costs and expenses incurred before the termination of the Contract and losses, damages and loss of profit suffered in consequence of the termination, pursuant to Articles 26.8 and 24.8 of the Contract, as well as reasonable interest thereon and currency appreciation ("rivalutazione monetaria");*

- *In the second alternative, in the event the Tribunal accepts the defenses raised for the first time by Respondent via e-mail on November 15, 2006 (notwithstanding their untimely submission) that the contractual documents violated Albanian law, to assess damages of the same amount due to the Claimants for breach of representations and warranties, and any other damages available under applicable law;*

- *Order Respondent to indemnify all costs of the arbitration, including the reasonable value of its employees engaged in prosecuting this arbitration claim, and any and all legal and arbitration fees, plus reasonable interest thereon; and*

- *Award Claimants any other relief the Tribunal deems appropriate under the circumstances.*

*In the event, as anticipated by Respondent on November 16, 2006, that material defenses will be submitted in the future (without having been reasonably advanced within the time limits contemplated by the ICC Rules), the Claimants reserves the right to modify or amend its claims, and/or seek additional damages.*

*b) Respondent asks the Tribunal to award the following relief:*

- *Rule that there is no effective contract, and that Respondent has no obligation whatsoever to perform under it;*

- *Rule that Respondent is not obliged to compensate Claimants for anything;*

- *Order Claimants to pay all costs of the arbitration, including the expenses incurred by the government of Albania, its defence team, its working group and administrative expenses, all legal and arbitration fees, plus interests; and*

- *Determine that this arbitration process has damaged Albania's standing as an attractive country for investors, and award Respondent any relief appropriate under the circumstances to compensate the damage done to the credibility and standing of Albania in the eyes of serious international investors at a moment when the government of Albania is making huge efforts and creating new perspectives and opportunities for such companies to come and invest in the country".*

16. The Terms of Reference also include, in Article IX, the following provision:

*"The Arbitral Tribunal will resolve, with regard to article 19 of the Rules, all pertinent preliminary and/or merit questions raised or to be raised by the parties' submissions and statements.*

9

> *Particularly, but with no restriction, the Arbitral Tribunal will, in one or more awards as it will deem appropriate, and in the order it will deem more suitable, address the facts and arguments summarised in Sections III and IV of the present Terms of Reference, and rule upon the claims mentioned in Section V of the present Terms of Reference. According to Article 18.1 d) of the Rules, the Arbitral Tribunal does not consider appropriate to set a list of issues to be determined".*

## X. The Arbitral Proceedings after the Signature of the Terms of Reference:

17. On 21 November 2006, the Arbitral Tribunal issued its Procedural Order n°1, dealing with the organisation of the proceedings, as well as the Provisional Timetable.

18. On 15 December 2006, in accordance with Section II (A) § 1 of the Provisional Timetable, Claimants notified their Submission n°1 with the expert opinion of Prof. Guido Alpa, the witness statement of M. Sam Zadeh, exhibits C.37 to C.43, and CL.1 to CL.22.

19. On 31 January 2007, in accordance with Section II (A) § 2 of the Provisional Timetable, Respondent notified its Submission n°1 with exhibits R.1 to R.13.

20. None of the parties made any request for additional documentary productions in accordance with Section II. B of the Provisional Timetable.

21. On 22 February 2007, Claimants informed the Arbitral Tribunal that they intended to forego their opportunity to reply to Respondent's Submission n°1. On 28 February 2007, Respondent informed the Arbitral Tribunal that it nevertheless whished to have leave to notify a second submission and to produce experts/witness statements. On 28 February 2007, Claimants informed the Arbitral Tribunal that it did not object, in principle, to Respondent notifying such a second submission, but requested to have leave to submit a post-hearing brief.

22. In view of such exchange of correspondence, the Arbitral Tribunal sent to the parties, on 28 February 2007, a letter which reads as follows:

> *"The Arbitral Tribunal notes that:*
>
> *a) Claimants do not intend to avail themselves of the possibility of replying to*

*Respondent's Submission n°1, as provided by Section II C. of the Provisional Timetable;*

*b) Respondent nevertheless wishes to have leave to notify a second Submission, with experts/witness statements as the case may be;*

*c) Claimants do not object, in principle, to Respondent notifying such a second submission, but requests to have leave to submit a post-hearing brief;*

*d) Respondent has required, in page 39 of its Submission n°1 (and in its letter of 27 February), that Claimants be compelled to produce copies of the Italian Supreme Court decisions quoted in Prof. Alpa's Expert report, with English translations of the same;*

*e) Claimants object to such request, as the relevant excerpts of said decisions are already quoted in Prof. Alpa's report and a full translation of all quoted decisions would consequently be useless and excessively burdensome.*

*In view of the above, the Arbitral Tribunal has taken the following decisions:*

*a) Although the Italian decisions quoted by Prof. Alpa in his report may be publicly available, the Arbitral Tribunal believes that a copy of the same should be provided by Claimants, in accordance to common practice in international arbitration. As a consequence, Claimants will produce copies of all court decisions mentioned or quoted in its Submission n°1 and in Prof. Alpa's Expert report by 14 March 2007;*

*b) The Arbitral Tribunal notes that Respondent was able to analyse the Italian Supreme court decisions quoted by Prof. Alpa in their Italian original version (p. 39 of Respondent's Submission n°1). In view of Section XI (b) of the Terms of Reference, Respondent is nevertheless entitled to receive English translations of such court decisions. However, considering the burden of translating such decisions in their entirety where they may only be partly relevant, the Arbitral Tribunal decides that only those excerpts of the decisions that Claimants believe to be relevant to the case may be translated in English. Such translations will be submitted within the time-limit mentioned above in § (a). Claimants will proceed as indicated in Section II C (2) of the Procedural Order n°1;*

*c) Respondent has leave to submit its Submission n°2 in spite of the fact that Claimants will not do so. In view of the fact that Claimants will not submit its Submission n°2, it is appropriate to shorten the time-limit provided in the Provisional Timetable. As a consequence, Respondent will notify its Submission n°2 by 11 April 2007. Such submission n°2 will be accompanied by any expert or witness statement Respondent intends to rely upon;*

*d) Each party may amend the list of its witnesses and experts by 25 April 2007;*

*e) The hearing dates are unchanged;*

*f) The parties will have leave to submit post-hearing briefs. The modalities of such submissions will be decided during the hearing"*.

23. On the same date, the Arbitral Tribunal established the Amended Provisional Timetable.

24. On 14 March 2007, in compliance with Section II. B. of the Amended Provisional Timetable, Claimants produced copies of all court decisions mentioned in Prof. Alpa's Expert report, as well as English translations of relevant excerpts of such decisions which Claimants intend to rely upon.

25. On 11 April 2007, in compliance with Section II. C. of the Amended Provisional Timetable, Respondent notified its Submission n°2 with the expert opinion of M. Mauro Baldissoni Esq. and the witness statement of M. Spartak Poçi.

26. On 21 May 2007, a hearing was organised in Rome, in which occasion Prof. Guido Alpa and M. Nicola Di Giovanni were heard as expert-witnesses, and M. Sam Zadeh as witness. On 23 May 2007, the Arbitral Tribunal rendered its Procedural Order n°2, containing *i.a.* the following:

> "*The hearing started at 09.15 a.m. The Chairman first asked the parties whether they had objections to the witnesses being present during the hearing, and none of the parties raised any objection thereto.*
> *The Chairman then raised the issue of Minister Poçi, who was presented as witness by Respondent, and who was not present. Respondent informed the Arbitral Tribunal that, for unspecified personal reasons, M. Poçi would not attend the hearing. The Chairman then asked Claimants, in view of Section II. D. 2 of the Procedural Order n°1, whether they had any objection to Minister Poçi's witness statement being nevertheless admitted in the proceedings. Claimants replied that they objected to such witness statement being admitted as written evidence. After having deliberated, and in view of Section II. D. 2 of Procedural Order n°1, the Arbitral Tribunal decided that Minister Poçi's witness statement shall be disregarded.*
> *The Chairman then raised the issue of M. Baldissoni, who has been presented by Respondent as Expert-Witness, and who was also not present. Respondent informed the Arbitral tribunal that, for unspecified reasons, M. Baldissoni would not attend the hearing, and asked leave to present M. Nicola Di Giovanni as Expert-Witness instead of M. Baldissoni. Claimants did not object to such request, provided that M. Di Giovanni made a disclosure of his*

*firm's professional links with the State of Albania. Such disclosure having been made at the hearing, the Arbitral Tribunal therefore decided that M. Di Giovanni would testify instead of M. Baldissoni. The Arbitral Tribunal also decided that M. Baldissoni's written statement would, for the purpose of the hearing, be considered as having been signed by M. Di Giovanni, and both parties agreed.*

*During the hearing, the Chairman inquired about the status of M. Caruso, and Respondent replied that M. Caruso acted as counsel for the Republic of Albania. Claimants did not object to such situation, provided that a power of attorney be established in favour of M. Caruso. Respondent declared that such power of attorney would be given to M. Caruso. The Arbitral Tribunal therefore took note that M. Caruso would act as co-counsel for Respondent.*

*These issues having been resolved, Prof. Alpa was examined by Claimants, and cross-examined by Respondent. M. Di Giovanni was then examined by Respondent, and then cross-examined by Claimants. Finally, M. Zadeh was examined by Claimants, and then cross-examined by respondent.*

*After M. Zadeh's testimony, Respondent raised an issue as to the content of his declarations, in that Claimants had directed questions to him on issues which were not dealt with in his written statement, in particular in respect to the reason why the date mentioned on the fax transmission of the Notice to Proceed is different from the date of that document. Claimants replied that such questions were admissible in view of Section II. D. 8 of Procedural Order n°1, because they addressed an allegation of forgery raised by Respondent after M. Zadeh's written statement was established. After having deliberated, and in view of the fact that the allegation of forgery was raised by Respondent in its Submission n°1, to which Claimants would have had an opportunity to reply had they not decided to forego their Submission n°2, the Arbitral Tribunal decided that the declarations of M. Zadeh upon direct examination by Claimants bearing on issues falling outside the scope of his Written Statement shall be disregarded.*

*Respondent finally asked the Arbitral Tribunal to reconvene Minister Poçi at a further hearing, in accordance with Section II. D. 14 of Procedural Order n°1. After having deliberated, and in view of the fact that no valid reason had been given for the absence of Minister Poçi, the Arbitral Tribunal decided to*

*reject such demand. The Arbitral Tribunal however reserved the right to hear M. Poçi at a later stage, would such hearing appear to be necessary for the resolution of the dispute.*

*The Arbitral Tribunal authorised the parties to submit post-hearing briefs, such briefs not to include any new document or any new argument of fact of law, save for the following:*

o *Claimants' reply to the objections raised by Respondent as to the Arbitral Tribunal's jurisdiction (i.a. Respondent's Submission n°1, p. 33; Respondent's Submission n°2, p. 3);*

o *Claimants' reply to the arguments raised by Respondent as to the applicability of Albanian law (i.a. Respondent's Submission n°1, pp. 28 and 46; Respondent's Submission n°2, p. 3);*

o *For both parties, existence of Italian court decisions (other than the Supreme Court's decision of 10 April 1970 already produced by Claimants) in respect to the admissibility of a claim for loss of profit based on Article 1358 of the Italian Civil Code.*

*The following timetable has been established for the exchange of the parties' post-hearing briefs:*

o *Claimants' post-hearing brief: 15 June 2007;*

o *Respondent's post-hearing brief: 6 July 2007;*

o *Claimants' reply to Respondent's post-hearing brief: 18 July 2007;*

o *Respondent's rebuttal to Claimants' post-hearing brief: 27 July 2007.*

*The parties will also, with their reply and rebuttal, notify their claims as to the costs of the arbitration and their defence costs.*

*The Arbitral Tribunal inquired whether any party had any objection as to the way the Arbitral Tribunal had conducted the proceedings, and each party replied that it had no such objection.*

*The Arbitral Tribunal therefore declared the proceedings closed pursuant to Article 22 of the Rules, save for the parties' post-hearing briefs, for any further question that the Arbitral Tribunal may decide to raise, or for any document of fact or law that the Arbitral tribunal may ask the parties to produce at a later stage".*

27. At its session of 1 June 2007, and pursuant to Article 24-2 of the Rules, the Court extended the time-limit for the rendering of the Award by the Arbitral Tribunal until 30 September 2007.

28. On 15 June 2007, Claimants notified their Post-Hearing Submission, with Exhibits CL.23 to CL.34.

On 6 July 2007, Respondent notified its Post-Hearing Submission.

29. On 18 July 2007, Claimants notified their Reply Post-Hearing Submission, with their submission on costs and Exhibits CL.35 to CL.42.

On 27 July 2007, Respondent notified its Rebuttal Post-Hearing Submission, with Exhibit RL.1.

30. At its session of 7 September 2007, and pursuant to Article 24-2 of the Rules, the Court extended the time-limit for the rendering of the Award by the Arbitral Tribunal until 31 December 2007.

31. At its session of 27 September 2007, and pursuant to Article 27 of the Rules, this Partial Award has been approved by the Court.


## XI. The Facts:

32. The dispute arises from a contract executed on 15 September 2003 (hereinafter "the Contract") for the modernisation of the "Tirana-Durres" and Rinas Airport railway sections (Exhibit C.1).

33. The modernisation of the Albanian railway system has been the subject-matter of a 1996 World Bank Study on *"the future role of Albanian railways"* ("hereinafter "the World Bank Study – Exhibit C.3), as well as of a report funded by the Austrian Government in 1999 (hereinafter "the Austrian Report" – Exhibit C.4), and of a study

conducted in 2002 by the Czech Government (hereinafter "the Czech Report", which has not been produced by the parties).

34. On 5 August 2002, the Ministry and GE signed a Protocol (hereinafter "the Protocol" – Exhibit C.5) whereby the parties agreed that GE would "*deploy a technical delegation for the start of site visit & inspection of the line*", that "*the final technical proposal of GE Transportation Systems shall be made available to the Albanian Railways for approval*", and that "*GE Transportation Systems, through its financial institution, will provide their feasibility study and the financial package proposal, containing the most suitable terms and conditions*". The Protocol also provided that approval of the financial scheme was expected by October 2002, and that the parties contemplated a starting of the construction phase by January 2003.

35. On 21 March 2003, further to preliminary studies made by GE, GE and the Ministry entered into a Provisional Contract (hereinafter "the Provisional Contract" – Exhibit C.6), setting forth the main provisions of the parties' future final agreement.

36. In the spring of 2003, and in coordination with the Ministry, GE held a tender for the purpose of identifying an entity able to carry out the civil works and track works provided by the Contract, which tender led to the selection of Athena.

37. On 15 July 2003, GE and the Ministry concluded their feasibility study (hereinafter "the Feasibility Study" – Exhibit C.7).

On 11 September 2003, the Provisional Contract and the Feasibility Study were approved by the Council of Ministers of Albania (Exhibit C.9).

38. On 15 September 2003, GE and the Ministry signed the Contract (Exhibit C.1). The Contract is composed of a "Contract Agreement" (hereinafter "the Contract Agreement") comprising 7 articles, of "Contract Conditions" (hereinafter "the Contract Conditions") comprising 31 articles, and of 5 Schedules (Schedule 1: Schedule of prices; Schedule 2: Technical Specifications; Schedule 3: Time Schedule/Programme Delivery; Schedule 4: Price Adjustment; Schedule 5: Rules Before the Adjudicator).

On the same day, GE and Athena signed a Consortium Agreement (hereinafter, the Consortium Agreement – Exhibit C.2) for the purpose of the performance of the Contract.

39. On 23 October 2003 (Exhibit R.5), the Council of Ministers of the Republic of Albania adopted a Decision n°702 whereby it decided "*to propose the draft law for "Ratification of the Contract Agreement, between the Government of the Republic of Albania and the company General Electric Transportation for the modernisation of the railway Tirana-Durres with rail connection to Rinas airport "Mother Teresa", as well as for the feasibility of this project"*.

40. On 3 November 2003 (Exhibit R.6), M. Sam Zadeh, GE's regional sales executive, wrote a letter to the Ministry whereby it stated, *i.a.*, "*that in this crucial stage of the project, it is extremely important that the Financial Arranger (the Bank) can be nominated by the designated Authority of your Government so that all the necessary interactions with the Government Export Credit Agencies such as SACE, US Exim Bank, and ECIO can be carried out for the purpose of finalizing all the financial arrangements and hence to bring the contract into force*".

41. On 13 November 2003, the Council of Ministers adopted a Decision n°763 whereby ABN AMRO was appointed as Financial Arranger for the financing of the project (Exhibit C.10).

42. On 14 November 2003, the World Bank sent a letter to the Ministry, expressing concern about the Contract due to the lack of a "*comprehensive and independent feasibility study for such a project*", and recommending that the Government consider to "*carry out international competitive bidding for selection of a contractor or concessionaire to carry out the project*" (Exhibit C.11).

43. On 19 and 20 November 2003, two meetings took place in presence of the Albanian Minister of transport (M. Spartak Poçi), the Minister's Chief of Cabinet (M. Prodani) and the General Manager of Railways (M. Leonard Yani), in respect to the initiation of the project (Witness Statement Sam Zadeh, § 13 and 14).

44. On 24 November 2003, the Ministry wrote to the World Bank and the European Department of the International Monetary Fund a letter in reply to *"your letters of November 14th 2003"* (Exhibit C.12), to which a copy of the Protocol was attached, emphasizing the importance of infrastructure works in Albania and pointing out, in respect to the "Tirana-Durres" and Rinas Airport railway sections, that *"over the past three years, three different feasibility studies were made by independent organisations and consultant companies"*. As to the reason why direct negotiations with GE were conducted, the letter pointed out that *"the Albanian Government opted for the most expedient procedure and quick action for the realisation of this project, ensuring the approval process is rigorous and transparent and involves all the Albanian decision making bodies such as Albanian designated Ministries, Council of Ministers and its Parliament"*. The letter concluded that *"Upon extensive evaluation and assessment made through the various feasibility studies, conducted by different independent international companies, and recommendation made, and subsequent to deep analysis of the expertise of our designated ministries and related organisation, and upon consultation with other European Union and neighbouring countries, the Government of Albania, through a decree of its Council of Ministers, has decided to put the implementation of this project at the top of its priorities. As a matter of fact in our forthcoming updating of the Medium Term Expenditure Plan, it is our firm intention to include this project within the list. Extensive assessment showed that the realisation of this project does not breach any of our commitments regarding non-concessional borrowing limited as it stays well under the amount of the suggested ceiling. In line with the decision of the European Union for realisation and full modernisation of Corridor 8, my Government has decided to contribute in this important decision, by starting the implementation of this project which is an important section of Corridor 8 so that Albania will be able to play a major role as transit country with associated and consequential revenue streams with the Regional Balkan Infrastructure & Communication system"*.

45. Claimants submit that, on 3 December 2003, it has been notified by Respondent with a "Notice to proceed" (hereinafter "the Notice to Proceed" – Exhibit C.9). The Ministry however denies the existence and regularity of the Notice to Proceed (Answer, page 4).

46. On 5 January 2004, the Ministry wrote another letter to the World Bank, suggesting further discussions regarding the proposed railway from Tirana to Durres. The World Bank replied on 7 January 2004 (Exhibit C.13), by stating that *"the impact on the budget of significant investments needs to be considered very carefully; decisions on such projects should be made only after undertaking detailed and independent feasibility studies; and public funds should be committed on the basis of competitive and transparent bidding, in accordance with Albania's Law on Public Procurement"*. The letter also outlined that the World Bank *"would be prepared to assist the Government to develop terms of reference for an independent feasibility study for the proposed railway line, as well as provide finance to the Government for such a feasibility study"*, and emphasized that *"formal discussions involving any particular commercial interest directly would be perceived as pre-empting a competitive and transparent bidding process. The Bank would consequently find it very difficult to engage in formal discussions in which any commercial representative was involved directly"*.

47. In February 2004, the Ministry and the World Bank agreed on the terms of reference under which a new feasibility study would be conducted (Witness Statement Sam Zadeh, § 17; Exhibit C.15). Such agreement was confirmed on 4 February 2004 by the World Bank to the Ministry (Exhibit R.10). Said letter, which does not appear to have been copied to GE, deals with the issue of the selection of the consultant as follows: *"we assume that prior to moving ahead with any investments, their compatibility with the IMF PRGF supported NSSED and the 2004-2006 MTEF would be agreed between the Government and the IMF, and such compatibility would not need to be analysed as part of the feasibility study per se* [...]. *We are pleased to note that the Government has decided to follow a competitive selection process, based on shortlisting qualified firms. Without the benefit of at least a basic competitive process (such as the Consultants Qualifications process mentioned in our letter of January 29, 2004), we are not in a position to offer a no objection to the short-listing of any firms.* [...] *We strongly recommend that, for such an important assignment, the Government should invite only those firms which have verifiable and required qualifications"*.

48. The terms of reference attached to said letter (Exhibit R.10) reads as follows: *"the Government is reviewing a signed Contract Agreement it has with General Electric Transportation System to modernise the Tirana-Durres Railway line with a new line to Rinas International Airport (the GETS project), including provision for new locomotives, coaches, personnel training, and telecommunications installations. However, the Government considers that it needs to have an understanding of the whole sector to take an appropriate decision regarding this specific investment"*. The consultant's terms of reference also provided for a specific review of the Contract, under the profile of investments, operating costs, passenger demand, and revenues.

49. In March and April 2004, the Ministry of transport made an international tender among five pre-qualified companies to select the consultant. In May 2004, Scott Wilson Railways Ltd. UK (hereinafter "Scott Wilson") was selected (Witness Statement Sam Zadeh, § 18).

50. The Tirana-Durres railway project seems to have, at that point in time, stirred some political controversy, as shown by an article published by M. Ilir Meta, a former Deputy Prime Minister and Foreign Minister, in a local newspaper on 12 March 2004 (Exhibit R.8).

51. On 11 June 2004, the Ministry officially authorised Scott Wilson to proceed with the feasibility study (Exhibit C.14 – this document is produced in Albanian with no English translation).

52. In its Country Report dated 18 June 2004 (Exhibit R.9, page 4), the International Monetary Fund expressed criticism in respect to the Contract, for (i) not having been analysed in the context of the country's power-reduction strategy (known as National Strategy for Socio-Economic Development, or NSSED), (ii) not having been concluded subject to an independent feasibility study, (iii) not having been considered in the loan-by-loan analysis underlying the definition of the non-concessional debt ceilings, and (iv) not having been considered within the context of a debt sustainability exercise.

53. On 22 June 2004 (Exhibit C.17), the Ministry of Finance of the Republic of Albania informed ABN AMRO Bank N.V. (hereinafter "ABN"), in its capacity as Financial Arranger under the Contract, that *"in accordance with our joint consultations, the ratification by the Parliament of the Agreement between the Republic of Albania and General Electric Transportation and the project feasibility study, will allow the Ministry of Transport & Telecommunication and the Ministry of Finance to realise quicker all the necessary procedures to begin the implementation of the project"* and requested ABN and GE *"waiting the finalisation of these legal procedures"*, to *"take all necessary steps to facilitate the concession of the extension of the "Promissory Guarantee" of SACE and US Exim Bank"*.

54. On 25 June 2004 (Exhibit C.18), the Ministry replied to a 7 June 2004 letter of ABN (which is not produced), by stating that *"the positive outcome of your mandate activities will be made available for approval by the Council of Ministers and its subsequent ratification of our Parliament after the positive result of the Project Assessment by the selected independent Consultant. We understand that the "Promissory Guarantee" of SACE and US Exim Bank expires on 1st July 2004. In this respect, we strongly request the support of both ABN AMRO Bank and General Electric so that all the necessary steps can be made in order to secure the extension of both SACE and US Exim bank coverage. Once again, we would like to assure you of the maximum support of my Government for this project being the same classified as one of our most strategic projects which will provide significant contribution to the future development of Albania in the region"*.

55. On 29 June 2004, ABN signed a "Mandate Letter and Indicative Financing Proposal" (hereinafter "the Mandate Letter" – Exhibit C.21), and sent it to the Ministry of Finance of the Republic of Albania.

56. On 10 July 2004, a letter quite similar to that sent the previous 25 June 2004 was sent by the Ministry to ABN (Exhibit C.19). Such letter of 10 July 2004 included, however, some variations in respect to the previous one. In particular, the Ministry mentioned that the outcome of the Scott Wilson study was expected by August 2004, and that it was also expected that, by then, the first phase of the ABN mandate would *"be accomplished as well so that a complete set of assessment and documentation will*

*be provided to the Parliament for ratification". The letter also mentioned that "based on the clarification letter issued by the Minister of Finance on 8 July [such document has not been produced], who is in charge by Council of Ministers to negotiate with ABN AMRO Bank, requesting the financial assessment and due diligence for the contract, it is now planned that the assignment of the activity to phase one will be given to you by our Ministry of Transport and Telecommunication. We have initiated the internal process for obtaining the approval for cost coverage of your assignment by our Council of Ministers. Obviously, during the execution of our activities, the designated staff of both the Ministry of Finance and Transport will be coordinating the efforts just to make sure that we will achieve our expected goals. To this effect, a team of Task Force formed by experts of the Ministry of Finance and Transport and Telecommunication will be designated to handle all the discussions and negotiations with you and associated organisations on fast track basis. In this regard, we would appreciate if you could provide to us your revised proposal of Mandate based on clarifications made recently at MoF and MTT latest by the end of this week so that the same can be finalised and signed as early as possible".*

57. In August 2004, Scott Wilson issued an interim report (Witness Statement Sam Zadeh, § 18).

58. On 6 October 2004, Scott Wilson issued a 188 pages final report (hereinafter "the Scott Wilson Report" – Exhibit C.16). Such final report was officially presented by Scott Wilson to the press and the Albanian Government on 22 October 2004 (Witness Statement Sam Zadeh, § 21).

59. In respect to the Contract, the Scott Wilson report concluded *i.a.* the following:

> Page 117: *"The GETS* [General Electric Transportation System] *business case produces a NPV* [Net Present Value] *of nearly 14.3 billion Lek and an IRR of 12%. These results seem very healthy and to provide a sound basis to proceed with the project. However, insufficient data has been provided regarding both cost and revenue estimates…"*

Page 118: "*The Project Team understands that the basis of the GETS contract is a resignalling scheme for the Tirana — Durres route section. The other equipment offers have been made on an incremental basis, in response to identified customer requirements.*

*The Project Team's assessment is that the re-signalling scheme is appropriate for the requirements of HSH, though there are some reservations over detailed track layout and system specification that should be addressed in detail by HSH and GETS in the development of the scheme.*

*The selection of route and specification for the Rinas Airport link appears robust and to address environmental considerations.*

*The Project Team believes that the suggested UK coaching stock is inappropriate for Albanian service. The locomotives are appropriate for Albanian use although the Project Team believes enhanced maintenance facilities will be required. In order for the locomotives to be compared with the principal alternative of diesel multiple units, train supply and driving trailers will be required for the Interegio DB coaches purchased by HSH.*

*The business case assumptions produced in the GETS Business Plan are optimistic and well beyond the levels on the rest of the system. The Project Team believes that the estimates of the impact of the Rinas Airport link carried out in the options reviewed above (Option 5) demonstrate that on its own the Rinas Airport link has a relatively neutral effect on the overall balance sheet. There are substantial financial benefits in terms of reduction of operating loss from providing new rolling stock and new signalling, though on the Project Team's conservative revenue estimates these benefits are insufficient to cover the servicing of the capital required for the link and certainly considerably less than the benefits predicted by GETS.*

*The Project Team concludes that the GETS contract is supportable in part. Provision of new signalling and replacement rolling stock produces positive returns and immediate safety benefits and should be proceeded with. The Rinas Airport link case is built on forecasts that are more optimistic than those adopted by the Project Team whose own analysis suggests that the link will not meet its full capital charges. However an economic cost-benefit analysis has not been taken into account in the investment appraisal.*

*For the GETS contract to proceed, the Project Team recommends that HSH:*

> • *Establishes a project implementation unit PIU*
> • *Conducts with GETS a technical review of the contract content and scope in order to optimise fully the project benefits*
> • *Develops user specifications*
> • *Develops service plans, staffing plans and maintenance plans*
> • *Identifies and develops suitable investment plans for all exclusions.*
> *The Project Team agrees that the GETS contract meets Albanian environmental requirements in terms of route selection and impact mitigation, provided a full Environmental Impact Assessment is carried out".*

60. On 25 October 2004 (Exhibit C.37), the Albanian Minister of transport wrote a letter to the Regional Coordinator of the World Bank, enclosing the Scott Wilson Report, and stating that: "*we believe that the suggestion of* [the World Bank] *to carry out the feasibility study has been absolutely a valuable suggestion and as a matter of fact, we are satisfied with the recommendations and indication of the Final Report as how to execute the roadmap of modernising the Albanian Railways, and in parallel how to save and optimise the operation and maintenance costs in various areas and many other good indications aimed to bring efficiency, reliability and service to the community in medium and long terms. To this regard, due actions will be naturally taken by our government. For what concerns the* [General Electric Transportation Systems] *Project, we are pleased to learn that the Consultant's Report finds the proposed* [General Electric Transportation Systems] *project as an absolute necessity and priority as it provides efficient railway system for future by guaranteeing sale and reliable operation through an adequate signalling system. In addition, the Report establishes that* [the General Electric Transportation Systems] *project responds to this need and* [that] *it also provides improved passenger rolling stock which is substantial benefit to HSH overall system. In particular, the Report also concludes that the link to Rinas Airport is consistent with the overall development strategy and the route selection has been proved to be robust. In a few areas of* [the General Electric Transportation Systems] *project, the Consultant has provided certain technical improvement to* [the General Electric Transportation Systems] *technical proposal in order to optimize the overall benefits of* [the General Electric Transportation Systems] *project. Such recommendations are well received and we have actually scheduled operational meetings with* [the General Electric Transportation Systems] *technical*

*team in order to discuss and agree on the modality of bringing such improvements during the project design stage and prior to the start of the construction.*

*Based on the positive outcome of the project assessment, the Government of Albania has given instructions to its various designated and concerned bodies in order to speed up all the necessary steps/actions aimed to finalize the various aspects of the project for its approval and ratification by both the Albanian Council of Ministers and Parliament".*

61. On 1 November 2004, the Respondent submitted a courtesy copy of the Scott Wilson Report to the World Bank, the IMF, the Albanian Ministry of Finance, the EU Mission, and the US and Italian embassies in Albania (Witness Statement Sam Zadeh, § 23).

62. On 15 November 2004 (Exhibit R.11), the World Bank sent to the Ministry its comments on the Scott Wilson Report. In respect to the Contract, the World Bank stated that: *"the report demonstrates that, even using optimistic assumptions, the proposed investments would have a negative NPV* [Net Present Value] *of some US$ 20 million, and are not sound economic proposition for the country. This conclusion is not surprising to us, given that the project is based on an unsolicited proposal and a sole source negotiated contract, rather than an open tender".*

63. In November 2004, Claimants participated to various meetings in the Netherlands and in Greece, which purpose was to ensure the satisfaction of various requirements expressed by the Scott Wilson Report and to discuss with the Greek Export Credit Agency (ECIO) the funding of the civil and track works of the project (Witness Statement Sam Zadeh, § 19 and 20).

64. On 17 December 2004 (Exhibit C.20), the Ministry of Finance of the Republic of Albania returned to ABN a signed version of the Mandate Letter. The accompanying letter stated that *"during the course of the past few months we have had continuous contacts with the* [Scott Wilson] *officials in Albania and in Washington to complete the assessment of the feasibility study for the project. This process is now close to the end and we believe that we will be able to start the implementation of the* [General Electric] *project very soon and, therefore, finalise the financing arrangements for the*

*project. In this context, in anticipation to the execution of the Mandate Letter by relevant Ministries, we kindly ask ABN AMRO Bank N.V. to start the activities envisaged under Phase 1 of the Mandate Letter and we undertake to reimburse Costs and Expenses and pay the work fee as defined in Phase 1 of the Mandate Letter. The relevant costs are to be incorporated in the overall financial package related to the project".*

65. From January to May 2005, the parties engaged in various preparatory activities (design and engineering, finalisation of the loan agreement – Witness Statement Sam Zadeh, § 27 and 28).

66. By two resolutions n°357 and 358 dated 20 May 2005 (Exhibit C.22 and Exhibit C.24 – these two documents have been produced in Albanian language, with no English translation), the Council of Ministers of the Republic of Albania approved the SACE Facility Agreement for the project, covering 85% of the Contract's value, and the Commercial Facility Agreement, covering the remaining 15% of the Contract's value.

67. On 28 May 2005, M. Spartak Poçi, the Albanian Minister of transport, made an announcement on the national television that the *"the project execution and Contract would proceed immediately given its important social and economic benefits for the country"* (Witness Statement Sam Zadeh, § 30).

68. On 20 June 2005 (Exhibit C.23 and C.25), the SACE Facility Agreement and the Commercial Facility Agreement were signed.

69. Also on 20 June 2005, the parties entered into an Addendum Agreement (hereinafter "the Addendum – Exhibit C.26) with the purpose of including Athena as party entrusted with the realisation of the civil works, and postponing the time-limit set by Article 7.2 of the Contract (such article providing that, in absence of realisation of the conditions provided by Article 7.1 by 31 December 2004, the Contract *"shall be deemed terminated without any direct or indirect liability of both parties"*) until 31 December 2006.

70. On 28 June 2005 (Exhibit R.12), GE sent to the Prime Minister of the Republic of Albania a letter stating that: *"following the Council of Ministers' ratification of the Financial Package last week, we witnessed the execution and signing of the Loan Agreements between the Albanian Ministry of Finance and ABN AMRO Bank with great satisfaction and appreciation. This has marked certainly an important step forward in the achievement of the expected results. As the utilisation of credit facilities supported by the various Government Export Credit Agencies, such as SACE, US Exim Bank and ECIO, is pending upon the ratification of the Albanian Parliament, we remain hopeful and confident that also this last step will be finalised positively and as early as possible, so that the project implementation can initiate soon"*.

71. In July and early August 2005, elections were held in Albania, and a new Government came into office in early September 2005 (Witness Statement Sam Zadeh, § 32).

72. On 26 September 2005, M. Sam Zadeh, Regional Sales Executive for GE, wrote to the Chief of Cabinet of the Prime Minister of Albania in order to confirm Claimants' *"desire to assist the Respondent in seeking the Contract's ratification by the Albanian Parliament"* (Witness Statement Sam Zadeh, § 34).

73. Having received no reply, on 30 September 2005 (Exhibit C.28), M. Sam Zadeh again wrote to the newly appointed Albanian Prime Minister – His Excellency Dr. Prof. Sali Berisha – expressing its will to discuss *"some critical issues that are arising with regard to one of our strategic projects in Albania – the Tirana-Rinas-Durres-Golem railway modernisation project"*. The letter stressed that *"given the urgency of some of these concerns, I would like to inform you about certain pivotal aspects of the Contract and the pending actions aimed to finalise the ratification and the related contract by the Albanian Parliament"*.

74. The parties met on 7 October 2005. According to M. Zadeh, both parties then confirmed their commitment to the project (Witness Statement Sam Zadeh § 35).

75. On 17 October 2005 (Exhibit C.38), further to a meeting in Tirana with the Prime Minister, M. Sam Zadeh sent an electronic message to M. Selami Xhepa, Economic

Advisor to the Prime Minister, advising that for various reasons the latest possible day for Parliament ratification of the Contract was 18 November 2005, and that the Loan Agreement and credit facilities could be cancelled if ratification did not occur by 15 December 2005.

76. On 18 October 2005, M. Sam Zadeh wrote a letter to the Secretary General of the Council of Ministers of the Republic of Albania (Exhibit C.28), and urged that another meeting be organised with the Ministers of Finance, Transport and Economy, in order "*to coordinate with them our forthcoming clarification meeting with World Bank, which is scheduled to take place next Friday 21st October 2005*". The letter also stressed that "*it is therefore highly important and fundamental that we meet with the above Ministers as early as their convenience so as to be able to coordinate with them the pending and preparatory activities deemed necessary for the ratification of the project at the Parliament, which needs to take place not later than 18 Nov. 2005 due to reasons as mentioned in our earlier correspondence to M. Xhepa, the Economic Advisor of M. Prime Minister (copy hereto attached)*" [such copy is not attached to the document produced].

77. On 31 October 2005, M. Sam Zadeh sent an electronic message to M. Xhepa, Economic Advisor to the Prime Minister, insisting on the actions to be taken to achieve the Contract's approval (Exhibit C.39). Similar messages were sent by M. Sam Zadeh on 1 and 2 November 2005 (Respondent's Submission n°1, page 24).

78. On 15 November 2005 (Exhibit C.30, second document), ABN sent to the Ministry a letter requesting payment of three invoices issued on 31 January 2005 and 27 May 2005 for legal fees and work fees pursuant to the Mandate Letter, and in respect to which the Ministry had announced, on 17 June 2005 (Exhibit C.30, third document), that they would be settled by 1 July 2005.

79. On 16 November 2005, M. Sam Zadeh sent another letter to the prime Minister, in respect to the issues already raised in its previous correspondence (Witness Statement Sam Zadeh § 39).

80. On 17 November 2005, in response to a request of the Republic of Albania for views about the project, the IMF and the World Bank wrote a letter to His Excellency M. Prime Minister Sali Berisha, expressing a negative opinion (Exhibit C.32).

The letter stated that "*the proposed project represents the first time that the Government of Albania has sought foreign financing on commercial terms at rates that are far higher than the concessionary financing available from the International Financial Institutions (IFIs). The scale of the project, and the concomitant budgetary implications, indicate that the project is likely to limit the Government's ability to implement other projects currently programmed in the context of Albania's National Strategy for Socio-Economic Development (NSSED). This in turn could outweigh any benefit that might be realised from the project attracting other private investment along the corridor. Given the large external financing needs required to upgrade Albania's infrastructure to European standards, and the limited ability to take on new debt, it is crucially important that any and all large public investments are made within well planned and prioritised national and sectoral investment strategies, consistent with the fiscal envelope available to the Government. The NSSED and Albanian National Transport Plan (ANTP), financed by the European Union, provide such a framework. Although these would not preclude the Government from identifying and proposing additional projects, any such proposed additions would need to be consistent with the broader development and strategic aims of the sector and the country and of high priority, and would have to be incorporated into these strategies. The ANTP suggests that urgent measures are needed to restructure the Albanian railways (HSH), improve services, support cost recovery and enhance the sustainability of railway operations. Once such restructuring is underway, some limited investments may be justified on the Tirana-Durres line within the context of a sound business plan. The lack of analysis of the economic and social benefits that might stem from the proposed project, which would be essential to justify the significant costs involved (equivalent to 1 percent of Albania's GDP), also presents a significant problem. The recent Scott William Report (SWR) prepared for the Government suggests that the proposed project would also generate a very large negative financial return. The World Bank is also concerned about the technical suitability of some of the proposed investments, which are also elaborated in the SWR.*

*Moreover, open and transparent competitive bidding is a prerequisite to ensuring the efficient allocation and use of scarce public resources".*

81. On 23 November 2005 (Exhibit C.40), M. Sam Zadeh sent to M. Xhepa a draft application letter for the purpose of obtaining an extension of the SACE Facility Agreement and the Commercial Facility Agreement.

82. On 1 and 2 December 2005 (Exhibits C. 41 and C.42), M. Sam Zadeh inquired on the signature of said application letter. On 3 December (Exhibit C.43), M. Xhepa announced an official letter of the Minister of Public Works and Transportation explaining the official government's position in respect to the project.

83. On 7 December 2005, a meeting was organised between His Excellency M. Prime Minister Sali Berisha, a delegation of the Government of Albania, and a delegation of GE, including M. Sam Zadeh. On 8 December 2005 (Exhibit C.29), GE wrote to His Excellency M. Prime Minister Sali Berisha a letter in which it stressed that *"in our previous communications over the past 8 weeks with your Economic Advisor, we noted that both the Italian and US Governments Export Credit Agencies (SACE and US Exim Bank) expected Parliament ratification to take place by late November because these State credit agencies would have required additional 4-6 weeks in order to finalise their endorsement by the year-end deadline. In addition, we noted that the validity of the Loan Agreement Contracts signed between the Albanian Government and ABN AMRO Bank were going to terminate if Parliament ratification did not take place by 15th December 2005 (ref. Clause 7.5.1. of the Contract); and this would naturally lead to the automatic cancellation of the entire financial package, causing the project to fall apart. When it became apparent that Parliament ratification would not happen in the desired timeframe, we asked your government to formally notify the Italian & US Authorities to provide a further time extension "on exceptional basis" so that the Government could be able to review the associated process. We provided a draft letter for your government's use to accomplish that as well. Unfortunately, no Request for Extension of Validity has been sent by your Government yet".* The letter expressed GE's concern of the lack of *"in-depth understanding and knowledge about the project"* on the Albanian side, and requested urgent meetings *"in order to understand what is the current position of your Government on this project and to*

discuss a clear course of remedial actions within the common interest of the Albanian Government and GE".

84. On 19 December 2005 (Exhibit C.31), the Ministry wrote to GE, informing that it considered the project "*premature when considering the budget constraints and the risk that this would pose to our public investment program in infrastructure projects already included on the list of priority investments for the next four years*".

85. On 12 January 2006, ABN sent a letter to the Ministry of Finance and to the Ministry (Exhibit C.30), informing the Republic of Albania that the SACE Facility Agreement had expired due to the lack of ratification by the Albanian Parliament, and requesting the payment of fees, costs and expenses due in virtue of the SACE Facility Agreement and the Mandate Letter (such amounts being due "*irrespective to that agreement being ratified by the Parliament and ahead of any further decision on the Project*" – page 4). The letter also requested the Ministry to provide "*an update on your plans relating to the project so that we can share it with the Export Credit Agencies (SACE, US-Eximbank and ECIO) that have been involved in this project with a lot of effort and patience*".

86. On 26 January 2006, GE replied to the 19 December 2005 letter of His Excellency M. Prime Minister Sali Berisha (Exhibit C.33), and stated that "*from a legal standpoint, the Contract [...] is fully enforceable and binding upon both parties. After the approval of the Mandate by the Albanian Council of Ministers to ABN AMRO as "Financial Arranger" and the subsequent execution of both SACE Facility & Commercial Facility Agreements (dated 20th June 2005) by and between the Albanian Government and ABN AMRO Bank, the conditions set forth in the Contract Agreement with respect to its effectiveness were satisfied. Further, the Albanian Government, through its Ministry of Transport, issued a formal "Notice to Proceed" letter to GE (3rd December 2003) regarding the project, instructing GE to proceed with the execution of the contract*".

87. On 14 March 2006, GE issued a "Notice of Default" (hereinafter "the Notice of Default") pursuant to Article 26-6 (c) of the Contract (Exhibit C.34).

88. On 16 May 2006, absent any response to its Notice of Default, GE claimed on behalf of Iliria's members certain amounts as damages as a consequence of the purported wrongful termination of the Contract (Exhibit C.36).

89. On 19 May 2006, the Ministry sent to GE a letter (Exhibit C.35) reiterating that the Republic of Albania had other priorities, and welcoming future cooperation with GE in the energy sector.

## XII. Main Relevant Contractual Provisions

90. As said above, this dispute arises from a contract entered into on 15 September 2003 ("the Contract") for the modernisation of the Tirana-Durres and Rinas Airport railway sections. The Contract was signed by M. Spartak Poçi on behalf of the Ministry of Transport and Telecommunications of the Republic of Albania, and by M. Silvano Brandi, as Legal representative of GE. The Contract is composed of a "Contract Agreement" (hereinafter "the Contract Agreement") comprising 7 articles, of "Contract Conditions" (hereinafter "the Contract Conditions") comprising 31 articles, and of 5 Schedules (Schedule 1: Schedule of prices; Schedule 2: Technical Specifications; Schedule 3: Time Schedule/Programme Delivery; Schedule 4: Price Adjustment; Schedule 5: Rules Before the Adjudicator).

91. As stated in Section XI of this Award, the cause of the dispute is Respondent's decision, confirmed in writing to Claimants on 19 December 2005 (Exhibit C.31), not to proceed with the performance of the Contract, due to *"budget constraints"*, and the consequent lack of ratification by the Albanian Parliament of the SACE Facility Agreement and Commercial Facility Agreement, which had been signed on 20 June 2005, and which entry into force was a condition precedent of the Contract.

92. The parties' disagreement mainly lies on whether the Contract is valid, entered into force, and whether liability can derive for Respondent from its non entry into force and/or non performance.

93. Pursuant to Article 31 of the Contract Conditions "*the Law which is to apply to the Contract and under which the Contract if to be performed shall be the substantive law of Italy*".

94. Pursuant to Article 6 of the Contract Agreement, Respondent represented and warranted that:

> "*a) it has full capacity and authority, and has obtained full authorisations and/or approvals, which are needed to execute and perform this Contract under the Albanian law and any other applicable law;*
>
> *b) the negotiation process and the execution of this Contract has been carried out in compliance with the Albanian laws and regulations and any other applicable law and regulation;*
>
> *c) the execution and delivery of this Contract and the consummation of the transaction contemplated thereby will not conflict with, or result in a breach of, any ordinances, orders, judgments and decrees of any court, commission or other authority or body to which it is bound;*
>
> *d) the execution of this Contract has been approved by the Council of Ministers and by the Parliament of the Republic of Albania*".

95. Pursuant to Article 7.1 of the Contract Agreement, the entry into force of the Contract was subject to the following conditions precedent:

> "*i) an Export Credit Agreement (ECA) with direct disbursement to the Contractor has been fully signed by the Albanian Government represented by the Ministry of Finance and a financial institution on international standing (the Financial Arranger);*
>
> *ii) the ECA has come into force and full effect;*
>
> *iii) the Financial Arranger has delivered to the Contractor a letter of undertaking by which the Paying Agent Bank shall pay to the Contractor the Contract Price according to the terms set forth under Clause 16 of the Conditions;*
>
> *iv) the Contractor has received the advanced payment under Clause 16.2.a and 16.6.a of the Conditions*".

96. It is not disputed between the parties that, on 20 June 2005, two credit facility agreements (the SACE Facility Agreement and the Commercial Facility Agreement) were signed between Respondent and ABN AMRO Bank as Financial Arranger (Exhibits C.23 and C.25; Witness Statement Sam Zadeh, § 29), for a total amount covering the Contract price provided in Article 5 of the Contract agreement. It is also not disputed between the parties that those two credit facilities are referred to as "the ECA" in Article 7.1 of the Contract Agreement.

97. As a consequence of the signature of SACE Facility Agreement and the Commercial Facility Agreement, the condition precedent provided by Article 7-1 (i) of the Contract Agreement was therefore met. As to the conditions provided by Articles 7-1 (iii) and (iv) of the Contract Agreement, they are both in favour of Claimants, and the parties did not take issue out of them. At any rate, none of the parties has submitted that one of these two conditions could have prevented the entry into force of the Contract.

98. As to the condition provided by Article 7-1 (ii) of the Contract Agreement, it refers to the fact that the ECA (i.e. the SACE Facility Agreement and the Commercial Facility Agreement) *"has come into force and full effect"*. In respect to the entry into force of those credit facility agreements, reference has to be made to Article 7.5.2 of the SACE Facility Agreement and to Article 7.5.2 of the Commercial Facility Agreement, both providing that *"the available facilities shall be automatically cancelled if the Parliament of Albania has not ratified this Agreement by 15 December 2005"*, and to Schedule 2 of the SACE Facility Agreement and Schedule 2 of the Commercial Facility Agreement, both providing in identical terms that the credit facility agreements are *i.a.* subject to the condition precedent that they be approved by the Government and ratified by the Albanian Parliament. None of these conditions realised. As a consequence, ABN-AMRO wrote to Respondent, on 12 January 2006 (Exhibit C.30), that *"as a result of the lack of ratification of the agreement by the Parliament of Albania, the availability of the Facilities under the SACE Facility Agreement have expired as of 15 December 2005"*.

99. None of the parties has taken issue of the other conditions precedent provided by Schedule 2 of the SACE Facility Agreement and Schedule 2 of the Commercial Facility Agreement by submitting that they did not or would not have normally realised. It is therefore to be concluded, as indicated by ABN-AMRO in its 12 January 2006 letter, that the SACE Facility Agreement and the Commercial Facility Agreement did not enter into force because of the lack of parliamentary approval. The non-entry into force of the credit facility agreements being a condition precedent of the Contract, the latter did consequently also not enter into force.

### XIII. Summary of the Parties' Positions:

#### A) Claimants' Position:

100. While Claimants had initially requested specific performance, they subsequently limited, in their Submission n°1, their prayer for relief to an award for damages.

101. Claimants agree "*that the Contract was not rendered effective, and this was due to the failure to fulfil the condition precedent under Article 7.1* [of the Contract Agreement] *by the deadline of December 31, 2006 (Section 7.2 as modified in the Addendum)*" (Post-Hearing Brief, § 35). Claimants also allege that such fulfilment "*depended on certain steps being taken by the Respondent to perfect them, in order to preserve the interests of both the Claimant and the Respondent*", because an accentuated good faith is required on the part of the responsible party with respect to the fulfilment of conditions precedent as stated in Article 1358 of the Italian Civil code (Submission n°1 § 23-30). Claimants therefore submit that, by failing to secure the necessary parliamentary approval, Respondent breached its duty of good faith pending the conditions precedent, and is consequently liable pursuant to Article 1358 of the Italian Civil code. According to Claimants, Respondent's refusal to perform its obligations was wilful, and motivated by the fact that the new Albanian government had different priorities (Post-Hearing Brief, § 44-45). As we shall see in subsequent sections of this Award, the Arbitral Tribunal finds such submissions to be well grounded.

102. Claimants further submit to have been notified by Respondent, on 3 December 2003, with a Notice to Proceed, which document *"simply provides additional grounds by which the Respondent became liable for the costs and expenses incurred by the Claimants in complying with the Respondent's instructions to start "immediate execution" of a part of the Contract's scope of work"* (Submission n°1, § 50).

103. Finally, Claimants posit that, even in the hypothesis in which the Contract would be held invalid under Albanian law, as submitted by Respondent, the latter would still be liable for breach of the representations and warranties (Submission n°1, § 45-49).

B) Respondent's Position:

104. Respondent first of all submits that the Contract is invalid because in breach of the Albanian Law on Public Procurement and Code of Administrative Procedures. According to Respondent, the Ministry should have required permission from the Albanian Public Procurement Agency prior to conducting a direct tender (Submission n°1, p. 31), which would render the contract invalid pursuant to Article 92 of the Albanian Civil code. In addition, Respondent posits that *"under the Albanian law on public procurement, the Respondent and Claimant could not enter into a Contract before the funds for the project were made available"* (Post-Hearing Brief, p. 15). The fact that the Contract was not authorised by the Parliament would also be a violation of the Albanian Code of Administrative Procedures (Post-Hearing Brief, p. 15). In addition, Respondent purports that the Contract should be held invalid based on Albanian Law n° 7973/95 "For concessions and the participations of the private sector in public service and infrastructure" (Submission n° 2 p. 5, Rebuttal Post Hearing Brief p. 6, 8 and 14), on the Albanian Constitution (Submission n° 1 p. 36), and on the Law n° 8371 "On entering into International Treaties and Agreements" (Rebuttal Post Hearing Brief p. 8).

105. Respondent also submits that the Arbitral Tribunal *"is not competent in determining or deciding on the validity of actions of the organs of the public administration of the Republic of Albania"* (Post-Hearing Brief, § 36), as well as in respect to the issue of whether the Contract is valid under the laws of Albania. As a consequence, Respondent requires the Arbitral Tribunal to *"order the suspension of*

*the actual proceedings until the legal issues* [relating to the validity of the Contract under the laws of Albania] *have been addressed and resolved by a competent authority, which in this case is the Albanian Court system"* (Submission n°1, p. 33).

106. Respondent further alleges that, even in case the Contract would not be considered illegal under the Albanian Law on Public Procurement and Code of Administrative Procedures, it should still be held invalid based on the requirement that it be approved by the Albanian Parliament. Evidence of such requirement would derive from the provisions of the Provisional Contract, as well as from the very reference to said approval in Article 6-1 of the Contract Agreement. In this respect, Respondent posits that the provision, in said article, that the Contract had already been approved by Parliament would be a *"clerical mistake"*, and was at any rate *"not intended to create any valid warranty"* (Submission n°2, page 11). Finally, Respondent alleges that the Contract's parliamentary approval would be required by Articles 121 and 122 of the Albanian Constitution, providing for the ratification of *"international agreements"* entailing *"the undertaking of financial obligations by the Republic of Albania"* (Submission n°1, page 34).

107. In respect to its alleged liability under Article 1358 of the Italian Civil code, Respondent puts forward three arguments. First, Article 1358 would not be applicable to the case at hand, as the ratification would not be a mere condition precedent of the contract, but rather *"an essential requirement or a logical assumption for the contract"*, which is to say that Respondent could not be bound by the good faith obligation provided by Article 1358 of the Civil code in respect of a contract which was *ab initio* devoid of any existence. Second, Respondent points out that the Ministry had no right to submit to parliamentary approval a contract contrary to Albanian law, so that no liability for breach of Article 1358 could derive from the omission to accomplish an act which performance was impossible. At any rate, the Ministry *"did all* [it] *could in order to facilitate the coming into force of the entire Contract"* and *"did not hinder in any way the fulfilment of the condition"*, which non-fulfilment *"was only due to independent circumstances which are not under Respondent's control"*, but rather to *"the recommendations of supranational organisations, such as the IMF and the World Bank, to which every country must conform pursuant to the principles of international law"* (Post-Hearing Brief, § 41). Third, the parties would, by

37

accepting the conditions precedent in Article 7-1 of the Contract Agreement, have *"accepted the risk that the Contract Agreement would never have become effective"* (Submission n°1, pp. 38-39; Post-Hearing Brief, § 42). Respondent points out, in this respect, that Claimants were well aware that, pursuant to the laws of Albania, the Contract needed to be ratified by the Parliament in order to become effective (Post-Hearing Brief, § 48). Finally, Respondent submits that Athena *"has no legitimacy neither to participate and be party to this arbitration, not to claim anything"* (Submission n°1, p. 46).

## XIV. Legal Analysis:

108. In order to decide upon the parties' pleas for relief, it is first of all necessary to address the jurisdictional objection raised by Respondent (**A**). Then, the question of Athena's *jus standi* in the arbitration will be addressed (**B**). The question of whether the Contract should be held invalid will subsequently be dealt with (**C**). The Arbitral Tribunal shall then decide whether Respondent should be held liable under Article 1358 of the Italian Civil code, which applicability to the case is disputed by Respondent (**D**). The Arbitral Tribunal will then deal with the nature and extent of Respondent's alleged liability (**E**), and address the parties' arguments relating to the other possible legal grounds of Respondent's liability, such as the Notice to Proceed or the purported breach of the Representation and Warranties (**F**). Finally, the parties' legal costs will be dealt with (**G**).

### A. Respondent's Objection on Jurisdiction:

109. In order to properly deal with Respondent's objection as to the Arbitral Tribunal's jurisdiction, the exact scope and meaning of such objection has to be clearly defined. In its Submission n°1 (p. 33), Respondent argued that the Arbitral Tribunal would have no jurisdiction to determine *"the validity of actions of organs of the public administration of the Republic of Albania"*, as the same would be *"subject to public law"*, namely the Albanian Law on Public Procurement and Code of Administrative Procedures. Respondent also submits that the Arbitral Tribunal would be deprived of jurisdiction in respect to the issue of whether the Contract is valid under the laws of Albania. Respondent therefore asks the Arbitral Tribunal to *"order the*

*suspension of the actual proceedings until the legal issues have been addressed and resolved by a competent authority, which in this case is the Albanian court system".*

110. In its Submission n°2, Respondent seemed to broaden the scope of its jurisdictional objection by submitting that the Arbitral Tribunal *"has no jurisdiction over such issues as the determination of whether there is a contract, whether the public laws of Albania have been violated, whether the constitutional process has been respected, and whether the law on Public Procurement has been violated".* Respondent therefore asked the Arbitral Tribunal *"to declare itself incompetent to decide on the Legal Issues 1, 2 and 3 filed in the Respondent's First Submission".* Such issues are: the fact that the Contract would be *"invalid as it violated the laws of Albania"* (Submission n°1, p. 28), the fact that the Contract would be *"inexistent, as it is not ratified by the Albanian parliament"* (Submission n°1, p. 33), and the fact that it would be *"ineffective, as the Financial Agreements have not been ratified by the Albanian Parliament"* (Submission n°1, p. 37).

111. In its Post-Hearing Brief, Respondent restated that *"the arbitration tribunal is not competent in determining or deciding on the validity or invalidity of actions of the organs of the public administration of the Republic of Albania"* (§ 36), in particular in respect to *"whether the public laws of Albania have been violated, whether the constitutional process has been respected, and whether the law on Public Procurement has been violated".*

112. The Arbitral Tribunal therefore understands Respondent's position to be that the assessment of the Contract's validity under Albanian mandatory rules would be prejudicial to the adjudication of the claims in this arbitration, and that, Albanian courts having exclusive jurisdiction to make such an assessment, the arbitral proceedings should be stayed.

113. Such jurisdictional objection is ill-grounded and shall be rejected.

114. It is to be recalled, first of all, that Respondent signed the Terms of Reference, which Section VI provide that *"the parties accept to submit to arbitration under the ICC Rules of International Arbitration, and do not dispute the jurisdiction of the*

*Arbitral Tribunal"*. No reference is made to any objection to the Arbitral Tribunal's jurisdiction in Section IV (b) of the Terms of Reference, whereby Respondent summarised its position, nor does Section V (b), whereby Respondent exposed its prayers for relief, mention any plea that the Arbitral Tribunal should decline its jurisdiction on all or part of the questions in dispute.

115. It is also to be noted that Respondent did not submit that the signatory of the Terms of Reference would have been deprived of valid powers, or that the Terms of Reference should have been authorised by the Government or ratified by the Parliament.

116. The Terms of Reference have therefore been validly signed on behalf of Respondent. Such document clearly refers to Claimant's purported contractual rights, as well as to Respondent's contention that the contract is invalid or ineffective. As a consequence, by signing the Terms of Reference, Respondent accepted the Arbitral Tribunal's jurisdiction to deal with these issues and to adjudicate Claimants' requests.

117. Respondent can consequently not be allowed, after having validly accepted in the Terms of Reference that the Arbitral Tribunal has jurisdiction to address Claimant's requests on the basis of the Contract, to submit that Albanian courts would have exclusive jurisdiction to assess whether the contract is valid or not.

118. Respondent can also not be allowed to pretend, on the basis of Article 6-3 of the Rules, that *"the fact that the Respondent signed the Terms of Reference didn't presume that he confirmed the jurisdiction of this Tribunal over the dispute"* (Post-Hearing Brief, § 38). Such an argument overlooks that Respondent accepted, in Section VI of the Terms of Reference, that it *"does not dispute the jurisdiction of the Arbitral Tribunal"*, such jurisdiction applying to the subject-matter of the dispute, which is precisely, *i.a.*, the validity of the Contract.

119. At any rate, even if Respondent had not signed the Terms of Reference, the jurisdictional objection should still be dismissed.

120. The Arbitral Tribunal takes it, as said above, that Respondent's position is not to dispute the validity *ab initio* of the arbitration agreement, but rather the arbitrability of certain aspects of the dispute, namely the validity of the contract under the profile of Albanian law. Respondent, as a matter of fact, did not submit that the arbitration agreement would in itself be invalid, but that the Arbitral Tribunal would not have jurisdiction to construe and apply Albanian mandatory rules. Based on such a contention, Respondent asks the Arbitral Tribunal to order a stay of the proceedings until the competent Albanian courts have determined such issue.

121. The Arbitral Tribunal notes, first of all, that while Respondent has explained at length in the arbitral proceedings why the Contract should be deemed invalid according to Albanian law, it has not initiated any court proceedings in Albania in respect to the disputed questions of Albanian administrative and public law. If Respondent really wanted this Arbitral Tribunal to consider a stay in order to allow an Albanian court to express its views as to the validity of the contract, the minimum expectation would have been that it takes the initiative of such court action.

122. The Arbitral Tribunal is, in any event, of the view that the question of arbitrability raised by Respondent is deprived of any relevance as long as this Arbitral Tribunal does not believe appropriate or necessary to apply Albanian law to address the issue of the Contract's validity. In this respect, it should be recalled that Section VIII of the Terms of Reference provides that *"the parties agree that their dispute shall be resolved according to Italian law"*, with no reference whatsoever to the laws of Albania, such provision being in full compliance with the parties' will, as expressed in Article 31 of the Contract Conditions. The mission that this Arbitral Tribunal has been entrusted with by the parties is therefore to apply Italian law, not Albanian law.

123. This does not mean, of course, that the Arbitral Tribunal, in the exercise of its jurisdictional powers, would not be able to apply the mandatory rules of a law other than that chosen by the parties, including Albanian law. But, as we shall see in subsequent sections of this award, there is in the present case no justification for doing so: this dispute will be resolved according to Italian law, according to the parties' common will. As a consequence, Respondent's contention that this Tribunal would not

have the power to construe Albanian mandatory laws is deprived of any practical relevance.

124. Besides, even in case this Arbitral Tribunal would need to apply Albanian mandatory rules in order to properly resolve the dispute, the contention that such rules would fall outside of its jurisdictional powers should still be rejected. As said above, the objection raised by Respondent is to be construed as a question of objective arbitrability of Albanian public policy laws. And it is hard to understand why an Arbitral Tribunal sitting in Rome under Italian substantive laws should apply Albanian law to such an issue of arbitrability. Italian law, which is the law of the seat of the arbitration, should rather govern the powers of the Arbitral Tribunal to apply mandatory rules of law. And it is settled law in Italy that mandatory rules are not, as such, to be considered as relating to rights that are not in the free disposition of parties, hence non arbitrable based on Article 806 of the Italian Code of civil proceedings (Court of appeals of Milan, 13 Sept. 2002, Riv. Arb. 2004, p. 105; Cass. 23 Feb. 2006, n°3989). As a consequence, in Italian law, the principle is that mandatory laws are arbitrable, and that principle applies to Italian as well as to foreign mandatory laws.

125. Finally, it is the Arbitral Tribunal's opinion that Respondent's position would not be meritorious even if its objection on jurisdiction applied to the validity *ab initio* of the arbitration agreement. Leaving aside that the valid signature by Respondent of the Terms of Reference, whereby both parties confirmed the Arbitral Tribunal's jurisdiction, would be sufficient ground to its jurisdictional powers to address the issue of the Contract's validity, it would be utterly contrary to the most basic principles of good faith to allow a State, after having signed an arbitration agreement and represented that the contract in which such agreement is included was approved by its Parliament, to disavow its commitment by arguing that it was incapable to submit to arbitration because the arbitration agreement lacked parliamentary approval.

126. International public policy would strongly oppose that a government, while dealing with a foreign private party, knowingly and willingly enter into an arbitration agreement which creates confidence in the other party, to repudiate its commitment once the arbitration proceedings have commenced (ICC Awards 1939, 2521, 3896,

4381, 5103, 7263, 7375; Fouchard Gaillard Goldman on International Arbitration, Kluwer, 1999, 558).

B. Athena's *Jus Standi* in the Arbitration:

127. Respondent submits that *"Athena has no legitimacy* [...] *to participate and be party to this arbitration"* (Submission n°1, p. 46). This objection is ill-grounded. As a matter of fact, the parties signed on 20 June 2005 an addendum to the Contract ("the Addendum" – Exhibit C.26), whereby Respondent acknowledged that GE had formed an unincorporated association named Iliria with Athena. The Addendum also amended 1.1.9 of the Contract Conditions to the effect of including Athena as a contractor. As a consequence of the foregoing, Athena became a party to the Contract and is therefore entitled to seek damages for the breach thereof in the same conditions as GE. The Arbitral Tribunal will therefore say that Athena has *jus standi* in this arbitration.

C. The Contract's Validity:

128. Respondent argues, on a number of different legal grounds, that the Contract would be invalid or inefficient. The bases for such contention are all drawn from mandatory provisions of Albanian law. Such provisions of Albanian law, according to Respondent, *"must be considered as mandatory provisions* [...] *binding on all those who are operating in Albania, whether Albanian or foreign, and are therefore binding upon the parties to the Contract as well, regardless of the fact that they chose a non-Albanian law as the law governing the Contract"* (Post-Hearing Brief, § 35).

129. The first question that arises in respect to said argument is whether it is at all admissible in view of the representations and warranties in Article 6 of the Contract Agreement (1). The second question is whether the Albanian public policy rules have valid title to be applied to the Contract, which the parties have subjected to Italian law (2).

### 1. Admissibility of the Invalidity Defence:

130. Respondent's contention that the Contract should be held invalid seems to be mainly grounded on three arguments. The first is that the Contract was signed without the prior consent of the Albanian Public Procurement Agency, in breach of Article 19 of the Albanian law n°7971 on Public Procurement, and would be invalid pursuant to Albanian Law n° 7973/95 "For concessions and the participations of the private sector in public service and infrastructure". The second is that parliamentary approval of the Contract is a validity requirement pursuant to Albanian Law n°8371 on International Treaties and Agreements, as well as to Articles 121 and 122 of the Albanian Constitution. The third seems to be that the parties could not have entered into the Contract before the funds for the project were made available. The last of these three arguments seem relate to the effectiveness of the Contract, rather than to its validity. The two first relate to its validity *ab initio*.

131. The parties did not ignore, when signing the Contract, those requirements of Albanian law. As a matter of fact, Article 6-1 of the Contract Agreement includes a declaration by Respondent that "*all authorisations and/or approvals needed to execute and perform this contract under the Albanian law*" had been obtained. Article 6-1 also includes a declaration by Respondent that "*the negotiation process and the execution of this contract has been carried out in compliance with the Albanian laws and regulations and any other applicable law and regulation*", and that "*the execution and delivery of this contract and the consummation of the transaction contemplated hereby will not conflict with, or result in, a breach of any ordinances, orders, judgments and decrees of any court, commission or other authority or body*". Article 6-1 finally includes a declaration according to which the execution of the Contract had been approved by the Government and the Parliament. Those representations and warranties are meant to cover the very circumstances that are now adduced by Respondent to sustain its submission that the Contract is invalid.

132. It is difficult to understand, in presence of the representations it made when signing the Contract, how Respondent can now submit that the execution of the same would result in a violation not only of the Albanian laws on Public procurement and Code of Administrative procedures, but also of the Albanian Constitution. In order to

justify the plain contradiction between its contractual representations and its submissions in the arbitration, Respondent submits that Article 6-1 of the Contract was *"merely stylistic"* and did not provide for *"any valid obligation"*. Respondent also submits, alternatively, that the declarations contained therein would have been caused by "[a] *clerical mistake or by an accidental slip in the drawing up of the Contract"* (Submission n°2, pp. 10-11).

133. None of these arguments seems to be excessively convincing. Representations and warranties are usually included into contracts for what they are intended to achieve, i.e. to represent and warrant facts upon which the parties are allowed to rely, and which have been determinant of their consent. In the case at hand, it seems pretty logical to the Arbitral Tribunal that the representations and warranties included in the Contract were intended to provide Claimants with assurances that no argument based on Albanian law would be put forward by Respondent to disavow its obligations. And it would require very strong evidence to convince this Arbitral Tribunal that those provisions accidentally slipped in the Contract. At any rate, evidence of such an accidental slip is nowhere in the file.

134. The question that therefore arises is whether Respondent should be allowed to disregard the representations and warranties it made to Claimants when signing the Contract to prove in the arbitration the exact contrary of what it declared and represented. The Arbitral Tribunal thinks not. Permitting Respondent to contradict its clear and unambiguous representations to disavow its contractual obligations would, as a matter of fact, be contrary to most basic principles of good faith in international trade. The prohibition for a party who has made a contractual representation to subsequently deny the content of such representation in detriment of the party who relied on it in good faith is known as *estoppel* in *Common Law* countries, *non concedit venire contra factum proprium* in Germany, *interdiction de se contredire au détriment d'autrui* in France, or *tutela dell'affidamento* in Italy (e.g. Cass. 13 Dec. 2004, n°23199; Cass. Civ 26 May 2004 n°10133 ; Cass. Civ. 19 Feb. 1993 n°2020; see also Marini, Italian report on protecting legitimate expectations and estoppel, *in La confiance légitime et l'estoppel*, Société de législation comparée, Coll. Droit Privé Comparé et Européen, Vol. 4, 2007, p. 295; Sicchiero, L'interpretazione del contratto ed il principio "nemo contra factum proprium venire potest", Contr. Impresa, 2003, p.

45

507; Fiesti, *Il divieto di "Venire contro il fatto proprio"*, Giuffrè, Milano, 2007). It is, as such, a general principle of international trade (Amco 25 Sept. 1983 jurisdictional decision; 2 Sept. 1983 Iran-US Claims Tribunal Award in *Woodward-Clyde vs. Iran*; ICSID 5 June 1990 Award Amco vs. Indonesia, ARB/81/1; ICC Awards 1512, 5926, 6363; see also Fouchard Gaillard Goldman on International Arbitration, Kluwer, 1999, 1462; Gaillard, L'interdiction de se contredire au détriment d'autrui comme principe géneral du droit du commerce international – Le principe de l'estoppel dans quelques sentences arbitrales récentes, Revue de l'arbitrage, 1985, p. 241). Said general principle is reflected by Article 1.8 of the Unidroit Principles, providing that "*A party cannot act inconsistently with an understanding it has caused the other party to have and upon which the other party reasonably has acted in reliance to its detriment*".

135. In the instant case, there is no evidence whatsoever that Claimant would have had valid reasons to doubt, when signing the Contract on 15 September 2003, that the representations and warranties in Article 6-1 thereto were unreliable or untrue. Quite on the contrary, the terms of the Protocol signed on 5 August 2002, whereby Respondent stated its "*firm belief* [...] *that a safe, reliable and efficient rail transportation* [...] *network in Albania is a key factor to its future economic, industrial and social development and growth*" and identified the project "*as one of Nation Priority Interventions*" (Exhibit C.5), were certainly such as to induce the belief that the Contract would be easily endorsed and approved by the Parliament. In addition, Article 12.1 of the 21 March 2003 Provisional Contract expressly referred to the need of parliamentary approval, so that Claimant was entitled to believe in good faith, when Respondent represented in September 2003 that such approval had been obtained, that it was so. In this respect, the fact that Claimants may have had knowledge that Albanian law required certain steps to be followed (as submitted in Respondent's Submission n°1, p. 25) is irrelevant. So is the fact that Claimants knew, after the Contract's signature, that parliamentary approval remained to achieve. What is material is not Claimants' abstract knowledge of the requirements set by Albanian law for the signature of an agreement such as the Contract, or Claimants' knowledge of the lack of parliamentary approval after the Contract's signature, but the fact that Claimants did not know, and had no reason to suspect, at the time when the Contract was signed, that Respondent's representations were untrue or unreliable. As a matter of fact, there was no reason to suspect, in presence of the Ministry's declaration that

all administrative steps had been followed to the effect of the Contract's conclusion, that this was not the case: who else than the Ministry could confirm in a reliable manner that the Contract was in accordance with the requirements set by Albanian administrative law? There is also no reason to require from Claimant a special standard of diligence in considering all the Albanian administrative regulations prior to the execution of the Contract, when Respondent had represented that the requirements provided by said regulations had been complied with. At any rate, the Ministry's declarations should at the minimum be taken for what they in fact are: a waiver by Respondent of its right to invoke Albanian law to assert that the Contract was not valid. From that standpoint, if Respondent had wanted to subject the Contract's validity to the subsequent approval of the Parliament, of the Government, or of the Public Procurement Agency, it could well have included a condition precedent in the Contract to that effect. Instead of doing so, Respondent represented that those formalities had already been complied with. This is very clear indication of the parties' intention to exclude Respondent's right to subsequently assert that such formalities were not complied with.

136. From that perspective, the Arbitral Tribunal disagrees with Respondent's contention that "*it is difficult to accept the idea that the Employer could seriously bind itself in the representation that the Contract was already ratified by the Parliament even before it was entered into by the parties. The ratification, in fact, is something which must come after the execution of a contract*" (Submission n°2, p. 9; Baldissoni WS, p. 6). Leaving aside that Article 6-1 of the Contract Agreement refers to an approbation of the Contract by the Parliament, and not to its "ratification", Claimants could well ignore whether the parliamentary procedures in Albania allowed the approval of a contract in the form of a draft.

137. The Arbitral Tribunal consequently concludes that overriding considerations of good faith prevent Respondent from alleging that the Contract would violate Albanian law when it declared the exact contrary in the Contract's Representations and Warranties.

### 2. Title of Albanian law to be Applied in the case at hand:

138. At any rate, the Arbitral Tribunal is of the view that, even if it were admissible, Respondent's contention that the Contract is null and void should in any case be rejected. First of all, the inclusion, in Article 6-1 of the Contract Agreement, of a declaration according to which the Contract is valid is to be taken as a waiver of Respondent's right to assert that certain conditions of validity provided by Albanian law would not have been met. In addition, and in any event, the Contract is subject to the substantive laws of Italy. The common will of the parties is therefore to refer to Italian law, not Albanian law, to construe the Contract and resolve any dispute arising from it. No restriction being included in Article 31 of the Contract Conditions as to the scope of the parties' choice of law, the latter is to be construed as applying not only to the substance of the Contract, but also to its formal requirements of validity. The same solution would be reached by referring to Articles 8-1 and 9-2 of the Rome Convention 1980, which reflect a widely internationally recognised rule, and which is also the rule of conflict applicable in Italy, the seat of this arbitration. From this standpoint, the Arbitral Tribunal disagrees with Respondent's contention that it should instead refer to the rules of conflict provided by Albanian law n°3920 *on the enjoying of the civil rights from the foreigners and the application of the foreign law"* (Rebuttal Post-Hearing Brief, §14). As we shall see hereinafter, the only possible title of Albanian law provisions to be applied to this dispute is as mandatory rules, not as rules of conflict. As a consequence, subject to the impact of Albanian mandatory laws, which issue shall be addressed hereinafter, the Arbitral Tribunal will say that Italian law is the law applicable to the validity of the Contract. As Respondent has not made any argument that the Contract would be invalid under Italian law, the Arbitral Tribunal has to conclude that it is valid under said law.

139. The Arbitral Tribunal may of course, in exercising its jurisdictional powers, apply mandatory rules provided by a law different than that chosen by the parties. Said power is justified by the States' legitimate interest that their mandatory laws be not circumvented by the parties' choice of law when they have a strong and legitimate title to be applied. In the instant case, however, it should not be overlooked that the State which interests are at stake (the Republic of Albania) is also a party to the Contract. While private parties should not be allowed to dispose of rules of public policy which

are strongly connected to the situation in dispute, the same is not true for States, who may well decide to set aside their own rules of public policy in order to achieve other goals, such as concluding international contracts with foreign parties for the purpose of attracting foreign investment in the country. In the case at hand, it is pretty clear that the Republic of Albania, by entering into a Contract submitted to the laws of Italy, and above all by representing that all requirements of Albanian law had been complied with, waived its right to seek that Albanian laws be applied.

140. It should also not be overlooked that mandatory laws alien to the law chosen by the parties can be applied in an international arbitration only in limited circumstances. The primary duty of an Arbitral Tribunal, as a matter of fact, is to adjudicate the dispute in accordance with the legitimate expectation of the parties that it will de decided according to the law that they have chosen, unless of course such choice appears to be fraudulent, which Respondent has not submitted in the instant case. Although this is an issue upon which there are divergent opinions, the Arbitral Tribunal is of the view that arbitrators are allowed to disregard the parties' substantive choice of law in only two circumstances. The first is when the foreign mandatory rule has a very strong connection with the dispute and when its application may be legitimately expected by the State which interests are at stake (ICC Award 6294, JDI (Clunet) 1991, p. 1050, note by Arnaldez; ICC Award 6320, JDI (Clunet) 1995, p. 896, note by Hascher; ICC Award 7528, *Yearbook Commercial Arbitration*, 1993 (XXII), p. 125; ICC Award 9163, JDI (Clunet) 2005, p. 1283, note by Derains). The second is when the mandatory rule at stake is part of international public policy, i.e. when it is a universally recognised rule which misapplication would go against good morals and offend the ethics of international trade (see, for all, L. Radicati di Brozolo, *Arbitrage commercial international et lois de police, considérations sur les conflits de juridictions dans le commerce international*, Recueil des Cours de l'Académie de Droit International de La Haye, Martinus Nijhoff, 2006, T. 315, p. 438-483).

141. None of these conditions would be satisfied in the case at hand. As a matter of fact, on the one hand, the State of Albania cannot have legitimately expected this Arbitral Tribunal to apply its administrative law, when it itself waived the application of said law in the Contract. On the other hand, it is pretty clear in the eyes of the Arbitral Tribunal that rules of administrative law provided for public procurement

contracts have a local character and are not part of internationally recognised rules of international public policy. For example, the requirement that a works contract receives parliamentary approval is not provided in most jurisdictions and cannot be considered as being an internationally admitted principle which violation would offend the ethics of international trade.

142. As a consequence of the foregoing, the Arbitral Tribunal will reject Respondent's argument that the Contract should be held null and void pursuant to Albanian laws.

D. Respondent's Purported Liability under Article 1358 of the Italian Civil Code:

143. As said above, Claimants acknowledge that, the condition precedent provided in Article 7-1 (ii) of the Contract Agreement having not realised, the Contract did not enter into force (Post-Hearing Brief, § 35). Yet, Claimants submit that Respondent should nevertheless be held liable for breach of Article 1358 of the Italian Civil code, which provides that: *"the party who undertook an obligation or transferred a right subject to a condition precedent, or who acquired under a condition subsequent shall, pending the condition, behave in good faith in order to protect the integrity of the other party's rights"*[1].

144. Claimants have argued, in this regard, that Respondent *"had a legal duty under Article 1358 to submit the Contract, the Addendum and the ECA to the Parliament"* (Post-Hearing Brief, § 40), and that *"after having both signed and approved by resolutions the SACE and the Commercial Facility Agreements, [Respondent] deliberately failed to submit the ECA to its Parliament for ratification and allowed the loan agreements to lapse without so much as requesting an extension of their validity"* (Submission n°1, § 33). This, according to Claimants, would all the more justify Respondent's liability that the latter *"informed the Claimant of its intention not to proceed with the Contract while the conditions remained pending"* (Submission n°1, § 34).

---

[1] Article 1358 reads as follows in Italian: *"Colui che si é obbligato o che ha alienato un diritto sotto condizione sospensiva, ovvero lo ha acquistato sotto condizione risolutiva, deve, in pendenza della condizione, comportarsi secondo buona fede per conservare integre le ragioni dell'altra parte"*.

145. Respondent first of all submits, in reply, that Article 1358 of the Italian Civil code would not be applicable in the case at hand, as "*the Parliament ratification did not merely represent a conditio iuris that is an institution falling within the broader concept of condition, but something different and coming before in the legal procedure of formation of the Contract. Such ratification constituted an essential requirement or a logical assumption for the Contract. As a result, the obligations under the Italian civil code pending the condition are not applicable in this context*" (Submission n°1, p. 38; Submission n°2, p. 5).

146. Respondent also submits that it could in any event have incurred into no liability pursuant to Article 1358, as "*under the Albanian Constitution, the Minister and the Ministry did not have the power to submit a draft bill to the Parliament*" (Submission n°1, p. 38). Finally, by accepting the conditions precedent, the parties would have "*expressly and explicitly accepted the risk that the Contract Agreement would have never become effective*" (Submission n°1, p. 39).

147. In order to deal with the issues so raised, it is necessary to first address the issue of Article 1358's applicability to the case (**1**), and then that of Respondent's purported liability (**2**).

### 1. Applicability of Article 1358 of the Italian Civil Code:

148. Respondent's argument is that the Contract's parliamentary approval should not be construed as a condition of the Contract, but as a necessary legal pre-requisite to its very existence, in respect to which Article 1358 would not be applicable. Such a position is ill-grounded. A legal pre-condition of a contract's validity is, in Italian law, construed as a *conditio juris* (*condizione legale*). It is certainly true that a distinction can be made between a condition precedent or subsequent, and a *conditio iuris*. The first – which is also called *conditio facti* – is an element that the parties have agreed to be a condition of the efficacy of the contract, while the second – sometimes also called *conditio tacitae* – is a pre-requisite of its very validity, provided by the law independently of the parties' will (Torrente Schlesinger, Manuale di diritto privato, Giuffrè, 1994, 134). While there might possibly be an issue as to the applicability of Article 1358 to a *conditio iuris* (although Prof. Alpa submits, in his opinion, that Art.

1358 would apply even in presence of a *conditio iuris*: Witness Statement Guido Alpa p. 15; such is also the position of Italian case law, see § 151 hereinafter), such issue can be left aside in the instant case. As matter of fact, as we shall see in subsequent sections of this award, the condition provided by Article 7-1 (ii) of the Contract Agreement should be construed as a *conditio facti*, not as a *conditio iuris*.

149. The condition provided by Article 7-1 (ii) of the Contract is that the ECA (the SACE Facility Agreement and the Commercial Facility Agreement) would come into force and full effect by the agreed deadline (i.e. 31 December 2006, as postponed by the Amendment). The SACE Facility Agreement and the Commercial Facility Agreement were in turn subject to parliamentary approval. It stems from the foregoing that the Contract was indeed subject to a future and uncertain event, but that such event was not a legal pre-condition of its validity. The entry into force of the SACE Facility Agreement and of the Commercial Facility Agreement cannot be considered as a *conditio iuris* because the entry into force of a credit facility is not a legal pre-condition of the validity of a contract of works. In the case at hand, the Contract could have been legally valid even in absence of a credit facility agreement, at least under Italian law. The entry into force of the credit facility is therefore to be construed as a condition precedent, and not as a legal pre-condition. The fact that the *realisation* of such condition precedent depended in turn from a condition set by Albanian law (the ECA's parliamentary approval) is irrelevant. While the condition that the financial arrangements be approved in Parliament may be a *conditio iuris* of the latter arrangements, it is only a *conditio facti* in respect to the Contract. To put it differently, Respondent's argument confuses the condition precedent provided by Article 7-1 (ii) of the Contract, and the *reason* why such condition precedent did not realise.

150. The submission that parliamentary approval should be qualified as a *conditio iuris* excluding the applicability of Article 1358 is misconceived from another perspective. And that is that the very concept of *conditio iuris* refers to an event which is required to give effect to a contract under the law applicable to the same. In the case at hand, approval by the Albanian Parliament cannot be considered as such in respect to a contract which formal validity is submitted to Italian law. As discussed in preceding sections of this award, Italian law is to be applied to assess whether the Contract is valid as to its form, and Albanian law has no title to be applied to such

question. There is, as a consequence, no reason to consider that a condition provided by Albanian law in this respect should be considered as a *conditio iuris* of the Contract when the parties agreed that it would be submitted to Italian law. Parliamentary approval may well (although it was not the case) have been raised at the level of a condition of validity of the Contract by the will of the parties, and in such case it should have been construed as a condition precedent, but it is given no such status by the *lex causae*.

151. At any rate, while the qualification of the condition as a *conditio facti* or a *conditio juris* might have been relevant if Claimants had based their requests on Article 1359 of the Italian Civil code (i.e. a request that the Arbitral Tribunal would consider the condition realised), which is not the case, it appears to have no relevance to the issue of the applicability of Article 1358 and to the extent of a party's liability thereto. As we shall see in subsequent sections of this award, the Italian Supreme Court has in fact ruled that the fact of having prevented the realisation of a *conditio iuris* is indeed a source of liability under Article 1358, in the same conditions than in respect of a condition precedent (Cass. 10 March 1992, n°2875; Cass. 3 Apr. 1996 n°3094), and that such liability extends to loss of profit (Cass. 10 April 1970, n°981; Cass. 3 Apr. 1996 n°3094).

152. As a consequence, the Arbitral Tribunal holds that Article 1358 of the Italian Civil code is applicable to the case.

### 2. Respondent's Purported Liability:

153. It should first of all be made clear that Respondent's purported responsibility does not imply that the Contract entered into force. Respondent's liability is in fact based on the fact that it purportedly *prevented* its entry into force. As a consequence, the argument that, by accepting to subject the Contract to certain conditions precedent which had to realise within a certain period of time, Claimants "*expressly and explicitly accepted the risk that the Contract Agreement would never become effective*" (Submission n°1, p. 39) is beyond the point. The issue here is whether Respondent's behaviour felt within the legitimate expectations of the parties, not

whether Claimants had abstractly contemplated the possibility that the Contract may never enter into force.

154. This being said, several other arguments submitted by Respondent deserve consideration. Respondent first of all objects that, given that the Contract was in breach of Albanian administrative law, *"the Minister and the Ministry did not have the power to submit a draft bill to the Parliament"* (Submission n°1, p. 38). More precisely, according to Respondent, *"pursuant to the Albanian Constitution, the parliamentary ratification totally goes beyond the authority of a Minister"* (Submission n°2, p. 7; Witness Statement Baldissoni p. 4). Respondent further submits that *"from an Albanian law perspective, instead of obstructing the fulfilment of the conditions, the Albanian Ministers did all they could in order to facilitate the coming into force of the entire contract. In fact, thanks to their activity, not only was the matter brought to the attention of the Council of Ministers but even, in the meeting of 23 October 2003, the Council proposed a bill to achieve the ratification of the Contract"*. As a consequence, according to Respondent, no liability could be incurred by the Minister because of the non-ratification: *"a different question is whether or not the ratification by the Parliament came after the proposal of the bill. That is a natural process in every democratic country. Surely we cannot attribute the responsibility of this fact to the Parliament, and certainly not to the members of the Government"* (Submission n°2, p. 7; Witness Statement Baldissoni, p. 4).

155. Respondent develops another line of defence, based on the content of the duty of good faith provided by Article 1358 of the Italian Civil code. According to Respondent, Article 1358 would not oblige the party to act positively in order that the condition realises, but only to abstain from any action such as to prevent the realisation of the condition. The mere omission would therefore not be a possible basis for liability under Article 1358, unless it related to an action that the party was contractually or legally obliged to accomplish (Witness Statement Baldissoni p. 5). In the case at hand, Respondent could not be held liable unless it was established that the Ministry had, under the laws of Albania, an obligation to perform an action that it failed to accomplish. And, according to Respondent, no evidence of such a failure would have been brought by Claimants (Post-Hearing Brief, pp. 18-20).

156. In order to address Respondent's arguments, it is first of all necessary to review Respondent's actions and/or omissions in respect to the condition in dispute (**a**), then to define what the requirements of Article 1358 of the Italian Civil code are and whether they have been met (**b**), and finally to assess whether Respondent is released from its responsibility thereto because of restrictions or impossibilities deriving from Albanian law (**c**).

<u>a) Respondent's Actions/Omissions in respect to the Condition:</u>

157. It is first of all necessary to point out that the Contract has been concluded by Claimants with the Republic of Albania. As a consequence, the assessment of whether Respondent complied with its duty of good faith pending the condition implies actions and omissions no only of the Ministry, but also of all other organs of the State, including the Government and the Parliament (Draft Articles on Responsibility of States, United Nations, 2001, Article 4). From this standpoint, Respondent's contention that the lack of parliamentary ratification could not, as such, give rise to liability (Submission n°2, p. 7; Witness Statement Baldissoni p. 4) is certainly ill-grounded.

158. This being said, the conditions in which the SACE Facility Agreement and the Commercial Facility Agreement were ultimately not approved should be briefly summarised.

159. On 23 October 2003, the Council of Ministers of the Republic of Albania adopted a Decision n°702 (Exhibit R.5) whereby it decided *"to propose the draft law for Ratification of the Contract Agreement between the Government of the Republic of Albania and the company General Electric Transportation for the modernisation of the railway Tirana-Durres with rail connection to Rinas airport "Mother Teresa", as well as for the feasibility of this project"*. Yet, no such draft ever appears to have been submitted to Parliament. Clearly, had such a law been presented to Parliament, it would be Respondent's duty to bring evidence thereto. As Respondent does not even allege that such law was presented in Parliament, the Arbitral Tribunal will draw the conclusion that it did not.

160. In May 2005, the Council of Ministers approved the SACE Facility Agreement and the Commercial Facility Agreement, which contracts were subsequently signed in June 2005. The condition precedent provided by Article 7-1 (i) was therefore realised. Yet, none of these contracts were ever presented to Parliament for ratification.

161. Finally, on 19 December 2005, the Ministry sent a letter to GE (Exhibit C.31) stating that it considered the project controversial as "*the scale of the proposed project and the related budgetary implications indicate that* [it] *would limit the Government's ability to implement other projects currently programmed*", and considering it "*premature*". At that point of time, the Contract's conditions precedent were still pending, the same having been extended by the Addendum (Exhibit C.26) until 31 December 2006.

162. As a consequence of the Ministry's decision, neither the SACE Facility Agreement and the Commercial Facility Agreement were ever presented to Parliament for ratification, and such contracts were therefore cancelled (Article 7.5.2 of the SACE Facility Agreement and Article 7.5.2 of the Commercial Facility Agreement provided that said agreements had to be ratified by the Parliament no later than 15 December 2005). The cancellation of the SACE Facility Agreement and the Commercial Facility Agreement entailed the non entry into force of the Contract.

<u>b) Content of the Requirement of Good Faith set by Article 1358:</u>

163. Against this backdrop, the Arbitral Tribunal has some difficulty in following Respondent's contention that "*the Albanian Ministers did all they could in order to facilitate the coming into force of the entire contract*" (Submission n°2, p. 7; Witness Statement Baldissoni p. 4). It is in fact crystal clear that, faced with the World Bank's opposition to the project, the Ministry decided to drop the project instead of ensuring its approval by Parliament. Whether such a decision should be cause of liability under the Contract is to be assessed on the basis of Article 1358 of the Italian Civil code.

164. What Article 1358 is all about is a duty of good faith cooperation pending the condition. The scope of that cooperation is to "*protect the integrity of the other party's interest*". According to the general function of good faith in Italian law, as set by

Articles 1175 and 1375, as a rule of conduct providing for duties of contractual loyalty and solidarity, Article 1358 is to be construed as imposing on each party a duty to protect the other party's interest, if need be by not exercising its own rights to the extent that this would not entail an excessive and unreasonable sacrifice of its interests (Cass. 9 March 1991, n°2503; Cass. 4 March 2003, n°3185; Cass. 30 July 2004, n°14605; Cass. 18 Oct. 2004, n°20399). The general principle of goof faith applies not only to the performance of the contract, but also to its conclusion and to its construction, and as such it determines the parties' behaviour in all phases of their relationship and entails a general duty of the parties to cooperate to the realisation of their common goal. The duty of good faith has accordingly been defined by the Italian Supreme Court as a duty of contractual solidarity entailing the obligation of each party to abstain from harming or prejudicing the other's interest (Cass. Civ. 18 Feb. 1999, n°1078; Cass. Civ. 5 Nov. 1999, n°12310; Cass. Civ. 11 January 2006, n°264; Cass. Civ. 7 June 2006, n°13345; see also Trabucchi, *Istituzioni di diritto civile*, Cedam, 1999; Rescigno, *Commentario al Codice Civile*, Giuffrè, 2001, 1422 seq.). Such duty of solidarity is grounded on Article 2 of the Italian Constitution, and goes as far as to require that a party should favour the regular performance of the other party's obligations, not only by avoiding that additional burdens be placed on said party, but also by clearing the path from possible misunderstandings and/or mistakes. As a consequence, even the party's inertia can be deemed to be a violation of its obligations to comply with its duty of good faith and fairness. What kind of behaviour these requirements entail in the instant case is therefore quite simple to understand: on one hand, the parties needed to refrain from actions that could prevent the realisation of the condition (Cass. 18 March 2002, n°3942). On the other, the parties had to perform all actions required to the effect of permitting the conditions' realisation (Cass. 6 Oct. 1972, n°2889; Cass. 27 Feb. 1980, n°1379; Mirabelli, Dei Contratti in generale, UTET, 1980, 246). There is, in this respect, no reason to limit the obligation set by Article 1358, as submitted by Respondent, to that of abstaining from taking actions contrary to the realisation of the condition (Cass. 1969, n°926; Cass. 1980, n°1379). In the case at hand, parliamentary approval of the SACE Facility Agreement and the Commercial Facility Agreement needed the Ministry to take action in order to secure their approval by Government and their presentation by the Government to the Parliament (Respondent's Post-Hearing Brief, pp. 22-23). These are actions that the Ministry and the Government had to take in order to permit the condition to realise

(Cass. 22 March 2001, n°4110; Cass. 28 July 2004, n°14198; quoted by Alpa, Witness Statement, § 14; see also Cass. Sez. Un. 19 Sept. 2005, n°18450). On the contrary, abstention from the Ministry and the Government to act accordingly had the inevitable consequence that the Parliament would not approve the financial arrangements, with the consequence that the condition precedent in Article 7-1 (ii) of the Contract would not realise.

165. As a consequence, the Arbitral Tribunal is of the view that Article 1358 of the Italian Civil code entailed the obligation for Respondent to seek parliamentary approval of the SACE Facility Agreement and the Commercial Facility Agreement within the time-limit provided by said contracts. Respondent failed to do so for reasons of pure convenience, i.e. its decision not to go against the World Bank negative opinion and its valuation that "*the scale of the proposed project and the related budgetary implications indicate that* [the] *project would limit the Government's ability to implement other projects*" (letter of 19 December 2005, ExhibitC.31). By doing so, Respondent sacrificed Claimants' interests to safeguard its own, which behaviour is without any doubt contrary to the duty of good faith imposed upon the parties by Article 1358.

### c) Is Respondent Released of its Responsibility by Albanian Laws?

166. As to Respondent's argument that the Ministry was prevented by Albanian administrative law from submitting the Contract to parliamentary ratification (Submission n°1, p. 38; Submission n°2, p. 7; Witness Statement Baldissoni p. 4), it is not up to the point. The issue here is not the Contract's parliamentary approval and/or ratification, which the Ministry represented in Article 6.1 of the Contract Agreement that it had been complied with, but that of the SACE Facility Agreement and Commercial Facility Agreement.

167. At any rate, the Arbitral Tribunal finds it quite inconsistent to submit that "*the Minister and the Ministry did not have the power to submit a draft bill to the Parliament*" (Submission n°1, p. 38), and at the same time that "*thanks to the* [Ministry's] *activity, not only was the matter brought to the attention of the Council of Ministers but even, in the meeting of 23 October 2003, the Council proposed a bill to*

*achieve the ratification of the Contract"* (Submission n°2, p. 7; Witness Statement Baldissoni p. 4). If the Council of Ministers adopted a resolution deciding to propose the Contract's ratification in October 2003, said ratification had to be possible for the SACE Facility Agreement and Commercial Facility Agreement as well.

168. Finally, as to the argument that Respondent would have been bound to abide by the position taken by the World Bank and the IMF *"pursuant to the principles of international law"* (Rebuttal Post-Hearing Brief, p. 13), it is without merits. The Arbitral Tribunal of course understands the weight of these institutions in a developing country like Albania, but the World Bank and the IMF are by no means empowered to issue rules of international law binding upon States. Respondent can therefore not impose on Claimants to bear the financial consequences of a change of policy that the World Bank and the IMF imposed upon it.

169. As a consequence of the foregoing, the Arbitral Tribunal will say that Respondent is not released by the provisions of Albanian law of its responsibility under Article 1358 of the Italian Civil code.

E. Nature and Extent of Respondent's Liability:

170. At this juncture, it is necessary to deal with the issue of the extent of Respondent's liability under Article 1358 of the Italian Civil code. Respondent first of all submits that *"Article 1358 entitles the other party to claim compensation only if the condition definitively occurred"* (Post-Hearing Brief, § 55). That submission stems from a misinterpretation of the opinion of certain Italian authorities. What the Italian authors quoted by Respondent in § 55 of its Post-Hearing Brief (Roppo, Bianca, Zaccaria) mean is that, when the aggrieved party seeks termination of the contract based on the other party's breach of its duty of good faith in respect to a condition precedent, that party's right to compensation might be subject to the realisation of the event set as a condition. The reason for this is quite simple. If the event does not realise for a reason extraneous to the actions taken by the party in breach, the causal nexus is broken: the loss suffered by the aggrieved party has then not been caused by the other party's actions in breach of Article 1358, but by the fact that the condition would in any event not have realised. Italian case law also considers that, when it is

59

the aggrieved party that seeks termination of the Contract, that party may not be entitled to loss of profit. The present situation is however totally different. In the instant case, Claimants did not declare the Contract terminated pending the condition. The reason why the Contract did not enter into force is not that Claimants terminated it, but that Respondent prevented the realisation of the condition in breach of Article 1358. In such a case, it is obvious that the aggrieved party is entitled to relief. Any other construction would render Article 1358 meaningless.

171. The proper issue is therefore not whether Claimants are at all entitled to relief, but the extent of their right to compensation. In this respect, Respondent submits that Claimants' right to compensation *"cannot include any positive interest (lucro cessante), because the Claimant cannot invoke any contractual liability of the Respondent"* (Post-Hearing Brief, § 59). To put it differently, Respondent submits that, the contract not having entered into force, the liability arising from Article 1358 should be qualified as non-contractual (torts), with the consequence that compensation for loss of profits should be excluded. Claimants submits, on the contrary, that the measure of the damages would be provided by the Contract itself, which Article 26.8 refers to loss of profits (Post-Hearing Brief, § 58). Claimants also submit that damages should in any case be determined by reference to the legal rules applicable to contractual liability (Post-Hearing Brief, § 64).

172. As to Claimants' submission that the measure of the damages should be determined by reference to Article 26.8 of the Contract Conditions, it is clearly without merits. As a matter of fact, the Contract not having entered into force, said provision is not applicable to Respondent's liability (Cass. 18 March 2002, n°3942). The extent of said liability is therefore to be determined based on Article 1358 of the Italian Civil code and other applicable legal provisions, not the Contract.

173. There appears to be divergent views amongst Italian authorities in respect to the issue of whether breach of Article 1358 allows the aggrieved party to seek loss of profit. Some authors submit that loss of profit can be sought (Chiesi, Exhibit CL.33, p. 79), and some that it would be excluded (Bianca, RL.1, p. 526). Such issue has however been settled by the Italian Supreme Court in its *Lisopharma* 10 April 1970 decision n°981. The case related to an assignment of medicinal formulas for

pharmaceutical products. The sale of pharmaceutical products is subject, in Italy, to a registration of the same, such registration being therefore a *conditio iuris* of the assignment. The seller having prevented the registration by prematurely putting the products on the market, the Supreme Court held that such party was liable for breach of Article 1358, and decided that "*when a legal condition does not realise because of one of the parties, the party in breach is liable for damages. The damages (article 1223 c.c.) include the loss of profits and the actual costs of the aggrieved party*". This solution appears to be confirmed by the characterisation of the responsibility based on Article 1358 as contractual, rather than on torts: "*the breach of the obligation to act in good faith pending the fulfilment of the condition, in order to protect the interests of the other party, gives rise to contractual liability*" (Cass. 19 July 1982, n°4236; Cass. 2 June 1992, n°6676; Cass. Civ. 16 Feb. 1993, n°1907; Cass. Civ. 3 Apr. 1996, n°3084, with note by Fr. Giordano, Giust. Civ. 1996, 9). As a consequence, pursuant to Article 1223 of the Italian Civil code, the party in breach is liable for the *damnum emergens* as well as for the *lucrum cessans*.

174. During the 23 May 2007 hearing and in its Procedural Order n°2, the Arbitral Tribunal inquired on the "*existence of Italian court decisions (other than the Supreme Court's decision of 10 April 1970 already produced by Claimants) in respect to the admissibility of a claim for loss of profit based on Article 1358 of the Italian Civil Code*". None of the parties has brought any evidence that the Italian Supreme Court changed its doctrine in respect to loss of profit since *Lisopharma*. As a consequence, the Arbitral Tribunal will say that Respondent is in principle liable to indemnify all Claimants' losses, including loss of profit, of course subject to evidence of the existence and amount of said losses.

F. Purported Liability on other Legal Grounds, such as the Notice to Proceed or the Purported Breach of the Representation and Warranties:

175. Respondent being liable under Article 1358 of the Italian Civil code and obliged to fully indemnify Claimants' losses, including loss of profit, it appears unnecessary to inquire whether it is also liable on the basis of the Notice to Proceed, or for breach of the Representations and Warranties. Such issues can consequently be disregarded.

## G. The parties Legal Costs:

176. The Arbitral Tribunal's decision on the parties' defence and legal costs is reserved until the Final Award.

§                              §

§

### Conclusion

The Arbitral Tribunal decides:

- that it has jurisdiction to decide on the parties' claims;

- that Athena has *jus standi* to be claimant in this arbitration;

- that the Republic of Albania breached Article 1358 of the Italian Civil code by deciding not to submit the SACE Facility Agreement and Commercial Facility Agreement to the approval of its Parliament;

- that the Republic of Albania is consequently obliged to compensate Claimants for losses (if any), including loss of profit, that Claimants may prove to have been caused by Respondent's breach;

- that any decision on the existence and amount of Claimants' losses is reserved until the Final Award;

- that all other decisions on the parties' requests are reserved until the Final Award.


Place of the arbitration: Rome

Date: 1 October 2007


Prof. Giorgio Bernini

Naim Isufi

Alexis Mourre

63