

**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration ● Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org   E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 14403/FM

### 1. GE TRANSPORTATION S.p.A.

(Italy)

### 2. ATHENA S.A.

(Greece)

acting together as sole members of "ILIRIA CONSORTIUM",

an unincorporated association formed under the laws of Italy

**vs/**

### THE REPUBLIC OF ALBANIA, MINISTRY OF PUBLIC WORKS,

### TRANSPORT AND TELECOMMUNICATIONS

(Albania)

This document is an original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

Final Award

in the ICC Arbitration n°14403/FM

between:

A) Claimant:

- GE Transportation S.p.A., a corporation organized and existing under the laws of Italy, having its registered offices at Via P. Fanfani 21, 50127, Florence, Italy;

(hereinafter "GETS"),

- Athena S.A., a company organized and existing under the laws of Greece, having its registered offices at 357-359 Av. Messogion, 15231, Athens, Greece;

(hereinafter "Athena"),

Acting together as sole members of Iliria Consortium, an unincorporated association formed under the laws of Italy.

(hereinafter jointly referred to as "Iliria", or "the Claimants")

Whose Counsel is M. Michael McIlwrath and M. Roberto Calabresi, GE Infrastructure Europe, Via Felice Matteucci 2, 50127 Florence, Italy (Tel: + 39.055.423.84.45; Fax: + 39.055.423.29.60), and M. Pericles A. Stroubos, Stroubos & Associates, 48, Patriachou Ieremiou St., 11475, Athens, Greece.

B) Respondent:

The Republic of Albania, Ministry of Public Works, Transport and Telecommunications. having its offices at Sheshi "Skenderbej" n°5, Tirana, Albania, through the State Attorney's Office;

(hereinafter "the Republic of Albania", "The Ministry", or "the Respondent")

Whose Counsel is Mrs Ledina Mandia, Consultant, Republika E Shqipërisë E Shtetit. Bulevardi "Deshmoret e Kombit" prane Hotel "Dajti". Tiranâ. Albania (Tel: + 355.4.253.544: Fax: + 355.4.253.544). and M. Simone Caruso, Tonucci & Partners. Via Principessa Clotilde. 7, 00196 Rome, Italy.

1

## INDEX

| | | | |
|---|---|---|---|
| I. | The Partial Award | | page 3 |
| II. | The Arbitral Proceedings after the signature of the Partial Award | | page 4 |
| III. | The Prayers for Relief | | page 7 |
| | A) | Claimants' Prayers for Relief | page 8 |
| | B) | Respondent's Prayers for Relief | page 8 |
| IV. | Summary of the Parties' Positions | | page 9 |
| | A) | Claimants' Position | page 9 |
| | B) | Respondent's Position | page 10 |
| V. | Legal Analysis | | page 11 |
| | A) | Claimants right to compensation | page 11 |
| | 1. | The principle of Claimants' right to compensation, including loss of profit | page 12 |
| | 2. | Athena's *jus standi* | page 14 |
| | 3. | The purported limitation of Claimants' right to compensation | page 14 |
| | | a) Article 22 of the Contract | page 14 |
| | | b) Contributory negligence | page 15 |
| | | c) Application of Italian Administrative Law rules | page 17 |
| | B) | Loss Assessment | page 19 |
| | 1. | Existence of the loss | page 19 |
| | 2. | Quantification of the purported losses | page 21 |
| | | a. Loss of profit | page 21 |
| | | aa. GETS's loss of profit: | page 23 |
| | | ab. Athena's loss of profit | page 26 |
| | | b. Direct costs | page 28 |
| | | c. Interest and currency appreciation | page 30 |
| | | d. Costs: | page 30 |
| | | da. Costs of the arbitration | page 31 |
| | | db. Reasonable defense costs | page 32 |
| | Conclusion | | page 33 |

## I. The Partial Award:

1. On 1 October 2007, the Arbitral Tribunal rendered the Partial Award, whereby it decided:

- that it has jurisdiction to decide on the parties' claims;

- that Athena has *jus standi* to be claimant in this arbitration;

- that the Republic of Albania breached article 1358 of the Italian Civil code by deciding not to submit the SACE Facility Agreement and Commercial Facility Agreement to the approval of its Parliament;

- that the Republic of Albania is consequently obliged to compensate Claimant for losses (if any), including loss of profit, that Claimant may prove to have been caused by Respondent's breach;

- that any decision on the existence and amount of Claimant' losses is reserved until the Final Award;

- that all other decisions on the parties' requests are reserved until the Final Award.

2. Sections 1-3 and 15-16 of the Partial Award include extracts of the arbitration agreement and relevant sections of the Terms of Reference. The Partial Award also includes, in sections 17-31 and 32-89, a summary of the proceedings until the Partial Award as well as of the facts in dispute, which need therefore not be restated in this Final Award. The Partial Award is incorporated by reference into this award.

**II. The Arbitral Proceedings after the signature of the Partial Award:**

3. On 25 October 2007, the Arbitral Tribunal issued the Provisional Timetable dealing with the organisation of the proceedings after the Partial Award, as follows:

- Claimants' submission on 10 December 2007
- Respondent's submission on 21 January 2008
- Hearings on 25 and 26 February 2008

4. At its session of 30 November 2007, the ICC International Court of Arbitration ("the Court") extended, pursuant to Article 24-2 of the ICC Rules of Arbitration ("the Rules"), the time-limit for the rendering of the award by the Arbitral Tribunal until 31 March 2008.

5. On 10 December 2007, in accordance with the Provisional Timetable, Claimants notified their Submission n°1 on the determination of losses, with the expert report of M. Alister L. Hunt, the witnesses' statements of M. Claudio Paccione, M. Konstantinos Kallianos, M. Michael Mc Grath, M. Ilias G. Zafeiropoulos and M. Silvano Brandi, and four bundles containing the following exhibits:

> ➢     C.44 to C.46-12
> ➢     C.46-13 to C.50-3
> ➢     C.51 to C51.12
> ➢     C.51-13 to C.51-25

6. On 15 January 2008, the Arbitral Tribunal accepted Respondent's request to extend the time-limit for the filing of it's submission until 11 February 2008.

On the same day, Claimants confirmed that they did not intend to request an extension of their own brief, in spite of the additional time granted to Respondent for the notification of its submission.

7. On 11 February 2008, Respondent notified its Submission n°1 on the determination of losses with the expert witness statements of M. Lorenc Koci and M. Enid Minarolli.

8. The parties' pleadings were heard by the Arbitral Tribunal during hearings held on 25 and 26 February 2008 in Bologna.

At the end of the hearing, the Arbitral Tribunal asked each party whether it had any objections as to the way the Arbitral Tribunal has conducted the proceedings so far, and each party replied that it had no such objection.

9. On 27 February 2008, the Arbitral Tribunal issued its Procedural Order n°3, including the minutes of the hearings as well as the following requests for production and clarifications to the parties:

> *"a) For Claimants:*
>
> *- A copy of the executive bid review prepared for the project by GETS, or evidence (such as correspondence, e-mails or internal memos) that any such forecast has been established within GETS prior to the signature of the contract;*
>
> *- Any similar cost analysis prepared for Athena's share of the works (other than the exhibit C.51.20);*
>
> *- The audit certification of GETS's 2004, 2005 and 2006 balance sheets;*
>
> *- GETS's certified 2007 balance sheets if available, or otherwise a draft of the 2007 balance sheets.*
>
> *- Athena's certified 2004, 2005, 2006 and 2007 balance sheets (or a draft of the 2007 balance sheets, if the same are not yet available).*
>
> *b) for Respondent:*

*Copy of all the legal material quoted in its submission on losses (being understood that all legal material to be quoted in the parties' post-hearing briefs should also be provided in copy to the Arbitral Tribunal".*

10. The Arbitral Tribunal also asked the parties, in the Procedural Order n° 3, to include in their post-hearing briefs comments as to the following issues or questions:

*"- Claimant's comments on the legal issues raised in Respondent's submission on losses, as well as in M. Minarolli's and M. Koci's written statements (including, but not limited to, the application of Italian regulations on public bids and Respondent's arguments as to Athena's right to compensation);*

*- For Respondent, further explanations on the meaning of § 90 (GETS accounting headings) of its submission on losses;*

*- Whether the amounts claimed by Claimants as direct costs would have been recoverable on top of the contract's price had the same been performed, and in the negative whether such direct costs would not represent double counting in respect to the loss of profit claim, would the latter be awarded;*

*- The possible impact on the dispute of article 1226 and 2056-2 of the Italian Civil Code;*

*- The possible application to the dispute of Section 22 of the contract".*

11. Finally, the Arbitral Tribunal asked the parties to include in their post-hearing briefs a final list of their claims and/or pleas for relief, and drew the parties' attention on the fact that any claim or plea for relief which would not be included in said final list would be considered waived.

12. In the same procedural order, the Arbitral Tribunal authorised the parties to submit post-hearing briefs at the following dates:

- for Claimant, by 28 March 2008;
- for Respondent, by 21 April 2008.

13. At its session of 7 March 2008, the Court ("the Court") extended, pursuant to Article 24-2 of the Rules, the time-limit for the rendering of the award by the Arbitral Tribunal until 30 June 2008.

14. On 28 March 2008, Claimants notified their post-hearing brief on the quantification of losses with exhibits C-52 to C-78.

On 21 April 2008, Respondent notified its post-hearing brief on the quantification of losses.

15. On 22 April 2008, the Arbitral Tribunal declared the proceedings closed pursuant to Article 22 of the Rules.

16. At its session of 6 June 2008, pursuant to Article 24-2 of the Rules, the Court extended the time-limit for the rendering of the award by the Arbitral Tribunal until 30 September 2008.

17. The present Final Award was approved, pursuant to Article 27 of the Rules, at the Court's session of 25 July 2008.

## III. The Prayers for Relief:

18. The parties' Prayers for Relief are, in the last state of their written submissions, the following:

A) Claimant' Prayers for Relief:

19. In its 28 March 2008 Post-Hearing submission, Claimants requested the Arbitral Tribunal to:

> "*i) Order the Respondent to pay the Claimants, the sum of € 15,984,455 and US$ 145,561 plus reasonable interest thereon and currency appreciation (rivalutazione monetaria) by way of compensation for all losses suffered by the Claimants in consequence of the Respondent's breach of article 1.358 of the Italian Civil Code;*
>
> *ii) Order the Respondent to indemnify all costs of the arbitration, including the reasonable value of Claimant's employees engaged in prosecuting the arbitration claim and any and all legal arbitration fees; and;*
>
> *iii) Award Claimant any other relief the Tribunal deems appropriate under the circumstances*".

B) Respondent's Prayers for Relief:

20. Respondent requested, in its 21 April 2008 Post-Hearing submission, the following relief:

> "*In the main and on the merits:*
>
> *a) To reject the application brought by the Claimants on the grounds that such application is groundless both factually and in accordance with law.*
>
> *Alternatively:*
>
> *b) To determine, applying legislation governing relations with public bodies and in accordance with the case law referred to, solely in the case of GETS, the amount of damages, applying the reductions provided for by law and by equity and in accordance with the criteria set out in its post-hearing submission (§ 112 and §113), meaning: 10% of the contract price after subtracting one fifth, reduced by 50% on*

*account of the fact that GETS neither lost nor reduced the full availability of its labor.*

*As a preliminary matter:*

*c) To request for an expert witness to be appointed by the Tribunal to ascertain and quantify the direct costs actually incurred – separately - by GETS and Athena and/or jointly by the Iliria Consortium and accordingly the extent of the loss of profit on the basis of the different arguments submitted by the parties;*

*d) To divide the legal costs respectively incurred and charge the party initiating these arbitration proceedings with the related costs".*

**IV. Summary of the parties' positions:**

21. The parties' positions, as expressed in their written submissions, can be summarized as follows.

A) <u>Claimants' position</u>:

22. Claimants seek compensation for their purported losses, including actual costs and loss of profit, for a total amount of € 15,984,455 and US $ 145,561.

23. To that effect, Claimants submit that the faulty non entry into force of the 15 September 2003 contract for the modernisation of the Tirana-Durres and Rinas Airport railway sections ("the Contract") caused them to suffer the following losses:

- GETS: € 809,024 as direct costs as well as € 10,619,024 and US$ 145,561.32 as loss of profit;
- Athena: € 1,313,640 as direct costs as well as € 3,242,766.56 as loss of profit.

24. Claimants purport that their loss of profit claims are based on estimates of the Contract's expected profit made by GETS and Athena prior to its signature.

according to normal practice in contracts of this magnitude. GETS submits that its executive cost review would be supported by its general cost/earning ratios, as evidenced by the balance sheets for the relevant periods. GETS further submits that its loss of profit assessment takes account of contingencies and fixed costs. Athena submits that its loss of profit is based on a cost estimate made prior to the signature of the Contract and recorded in a document named "top-sheet". Both parties have produced supporting documentation of their estimated costs for each relevant item.

25. In respect to direct costs, Claimants purport to be entitled to relevant compensation thereto in addition to lost profits, in that such costs were incurred to carry out indispensable preliminary activities in relation to the Project, including defining the technical aspects of the Project, securing the financial capabilities to enable Respondent to fulfil its payments obligations under the same and launching the Project following receipt of the notice to proceed.

26. Claimants submit that all heads of claim are in respect to non-mitigated costs which Claimants have been unable to recover in spite of all its efforts.

B) Respondent's Position:

27. Respondent submits on various grounds that Claimants should not be entitled to any compensation, essentially because the non-entry into force of the Contract was due to a pre-existing legal condition provided by Albanian Law (the approval of the financing agreements by the Parliament) rather than to a breach of its obligations. Respondent also submits that the loss would have been suffered anyway, as any proposal presented to the Parliament by the Albanian government would not have been approved.

28. Respondent also submits that, as the Contract did not enter into force due to the non-realisation of the condition precedent, its liability should be assessed according to the rules applicable to pre-contractual liability. which would preclude Claimants from seeking compensation for loss of profit.

29. Respondent further contends that, the Contract not having been performed and its performance costs hence not supported, Claimants would in reality have suffered no actual loss.

30. Respondent also purports that its liability should be excluded or limited by Article 22 of the Contract, or that it should be excluded on the basis of Claimants' own negligence, the same having been the sole cause of the loss suffered. In particular, Respondent submits that Claimants acted unwisely in refusing the proposal that was made to them to discuss alternative projects.

31. Respondent further contends that Italian administrative law rules applicable to the public administration's liability should apply to this case, with the consequence of limiting its liability to 10% of the Contract's price.

32. As to the amount of the damages sought, Respondent submits that it is based on mere hypothesis and that the claim has therefore not been proved with the required level of certainty. At any rate, according to Respondent, any loss of profit should be assessed by an independent expert appointed by the Arbitral Tribunal, not on the basis of documents submitted by Claimants.

33. Finally, Respondent submits that it did not receive proper notice of the constitution of the consortium Iliria, and that Athena would consequently be deprived of any right to act on the basis of the Contract.

## V. Legal Analysis:

34. As stated above, Respondent objected on various grounds to the existence of Claimants' right to compensation (A), as well as to the quantification of the purported loss (B).

### A) Claimants' right to compensation:

35. Respondent's objections relate to the principle of Claimants' right to be compensated. and in particular to receive damages for its purported loss of

profit (1). as well as to Athena's *jus standi* (2). Respondent, in addition, submitted on different legal basis that the damages awarded to Claimants should be reduced or capped (3).

> 1. The principle of Claimants' right to compensation, including loss of profit:

36. Respondent has dedicated large sections of its submission on the determination of losses ("the Submission n°1) and of its post-hearing submission ("the Post-Hearing-Brief") to re-discussing the Arbitral Tribunal's findings on issues which have already been decided in a final manner in the Partial Award.

37. In its Submission n°1, Respondent deals at length with the argument according to which it was faced with an "*objective impossibility*" to carry out the Contract due to the lack of parliamentary approval (Submission n°1, § 8-22, spec. § 16), when such issue has been resolved in a final manner in the Partial Award (see in particular § 148-152).

38. Respondent further contends that it did not breach its obligation to behave in good faith pending the condition (Submission n°1, § 29-44), which is also an issue decided in the Partial Award (see in particular § 157 seq.).

39. Respondent also argues on various grounds that Claimants would not as a matter of principle be entitled to claim compensation for loss of profit (Submission n°1, § 54-70 and 176-181), which issue has again been dealt with in the Partial Award (§ 173-174).

40. Respondent finally submits that its liability should be assessed according to the rules applicable to pre-contractual liability, so that "*the compensation cannot correspond with what* [Claimants] *would have been able to claim if the contract had become fully effective, but only to what – by effect of incorrect behavior in the negotiations (breach of the obligations of correctness and good faith) would have occurred with the loss of similar contractual opportunities if the injured party had not been awarded the contract de quo*" (Submission n°1.

§ 131; see also Submission n°1. § 145). Yet, such submission is again in plain contradiction with the Arbitral Tribunal's findings according to which Respondent's liability is to be assessed according to the rules applicable to contractual liability, and according to which Respondent is liable, in the terms of Article 1223 of the Italian Civil code, for the *damnum emergens* as well as for the *lucrum cessans* (Partial Award, § 173).

41. In sum, Respondent attempts to reopen the debate on issues which have already been discussed in the first phase of the proceedings. Respondent very openly declares, in this respect, that it hopes that the Arbitral Tribunal would accept to *"reconsider at least partially its own rulings"* (Submission n°1, § 117).

42. In the Partial Award, the Arbitral Tribunal has clearly established that Respondent is liable for breach of Article 1358 of the Italian Civil Code, and that Claimants are entitled to be fully compensated for their losses, including loss of profit.

43. That decision, although partial, is nevertheless final on the points that have been decided. The parties, by accepting the ICC Rules, have accepted that the Tribunal's decision is binding (Article 28-6 of the Rules). In addition, Article 824bis of the Italian Code of civil proceedings provides that the award has the same effects of a court decision. As a consequence, there is no doubt that the Partial Award has *res judicata* in respect to the issues it has decided.

44. All Respondent's arguments to the effect of denying (i) the principle of its liability for breach of Article 1358 of the Italian Civil code, and/or (ii) the principle of Claimants' right to compensation for the losses deriving from the non entry into force of the Contract, including loss of profit, shall therefore be declared inadmissible, and as such rejected.

45. The scope of the second phase of the proceedings is accordingly limited to whether Claimants established the existence of a loss, its causal nexus with the breach, and the loss assessment.

## 2. Athena's *jus standi*:

46. In its Post-Hearing brief (§ 80), Respondent challenges Athena's *jus standi* in the arbitration, by arguing that "*no notice to the effect that the Iliria consortium was constituted has ever been given or formally notified to the contracting party, the Albanian Ministry of Transport. Such notice is an essential condition for the aforementioned S.A. Athena to acquire the lawful status of consortium member*".

47. This argument, however, has already been decided in the Partial Award (§ 127), and is therefore inadmissible. The Arbitral Tribunal has already decided that Athena has *jus standi* to claim compensation against Respondent.

### 3. The purported limitation of Claimants' right to compensation:

48. Respondent argues that Claimants' right to compensation should be reduced or capped on three different theories: Article 22 of the Contract (a), contributory negligence (b) and Italian administrative law (c).

### a) Article 22 of the Contract:

49. In its Post-Hearing brief (§ 92 seq.), Respondent submits that its liability should be capped to 10% of the contract price pursuant to Article 22.2 of the Contract.

Claimants correctly point out (Post-Hearing brief, § 49), in this respect, that Respondent's liability is based upon Article 1358 of the Italian Civil code, and not upon the Contract, which did not enter into force.

50. At any rate, the argument is clearly ill-grounded. As a matter of fact, Article 22.2 provides that "*except in cases [of] gross negligence or willful misconduct, the liability of the Contractor to the Employer under this Contract for damages, loss of profit, loss of any contract or for any indirect or*

*consequential loss or damage in connection with the performance of the Works, shall in no case exceed 10% (ten per cent) of the total Contract Price"*. The Contractor is the Claimants, and the Employer is Respondent (Contract, page 1). It is therefore self-evident that such provision relates to Claimants' liability, not Respondent.

51. Nor would Article 22.1 of the Contract permit to limit or exclude Respondent's liability. First, as said above, any argument to the effect of excluding Claimants' right to compensation for their loss of profit would go against the Partial Award's *res judicata*, and would thus be inadmissible. The argument should thus have been raised in the first phase of the arbitration.

52. At any rate, Article 22.1 reserves the application of *"those provisions of these Conditions whereby the Contractor is expressly entitled to receive profit"*. As again correctly pointed out by Claimants, amongst those provisions is Article 26.8, which provides that in case of termination for Employer's (i.e. Respondent) default, *"the Employer shall pay the Contractor an amount calculated in accordance with Sub-Clause 24.8. The Employer shall pay in addition the amount of any loss or damage, including loss of profit which the Contractor may have suffered in consequence of termination"*. The Contract thus expressly provides for Claimants' right to be compensated for loss of profit in case of termination for Respondent's default. In the present case, the Arbitral Tribunal has ruled that Respondent is in breach of its obligations, and that the Contract did not enter into force due to such breach. In the context of the present arbitration, such situation should be considered as equivalent to that contemplated by Article 26.8. As a consequence, Article 22.1 is inapplicable and cannot serve to exclude Claimants' right to loss of profit.

  b) Contributory negligence:

53. Respondent argues that Claimants acted unwisely by refusing Respondent's offer to negotiate alternative solutions to the non entry into force of the Contract (Submission n°1, § 45; Post-Hearing brief, § 106-113), thus contributing to *"causing and bringing upon themselves the loss and damage*

*for which they now claim compensation"* (Submission n°1, § 75). Respondent therefore submits that the damages granted to Claimants should be reduced in application of Article 1227 of the Italian Civil code (Submission n°1, § 76).

54. The Arbitral Tribunal does not agree with Respondent's argument on contributory negligence. Article 1227 of the Italian Civil code in effect requires either evidence of negligence which would have contributed to cause the loss, or evidence that the aggrieved party could have avoided the loss by using ordinary diligence. In the case at hand, none of these conditions are met.

55. The fact which is adduced by Respondent as purported Claimants' negligence would in fact be that Claimants failed to respond positively to Respondent's letter of 19 December 2005[1], whereby Respondent informed Claimants that the Tirana-Durres rail line was *"premature"* and expressed the wish that Claimants take *"any initiative [...] to participate in any other priority projects already in the pipeline of our Public Investment Program"* (Exhibit C.31).Yet, it is difficult to understand how Claimants' behavior could be considered as having caused the non-entry into force of the Contract. It is in fact undisputed that the project was dropped due to the unilateral decision of the Government of Albania not to proceed with the project, and any Respondent's decision to accept *"other priority projects"* would not have changed this situation. Claimants' behavior can therefore not be considered as having caused, even in part, the non-entry into force of the Contract.

56. Nor could it be considered that Claimants could have prevented their own loss in all or part. First, the *"other priority projects"* referred to in Respondent's letter have never been precisely identified. Nor has Respondent provided any evidence of the *"new negotiating proposals"* (Submission n°1, § 52) that it would have made to Claimants in order to reduce its loss. Second, Claimants' loss was already entirely consummated when Respondent decided in an irrevocable manner not to perform the Contract. Third, there is sufficient evidence in the file that Claimants did all they could to try to convince Respondent to change its decision (see GETS's letter of 26 January 2006 -

---

[1] Respondent, in its Post-Hearing brief (§ 110) refers erroneously to the date of 15 December 2005.

Exhibit C.33). Finally, Claimants were in any case under no obligation to accept other undefined projects in lieu of the one that had been discussed in depth and carefully prepared since 2002.

<u>c) Application of Italian Administrative Law rules:</u>

57. Respondent first submits that its liability cannot be assessed according to general private law rules, but in consideration of its quality of public body (Submission n°1, § 95-100). As a consequence, according to Respondent, "*the Albanian Public Administration cannot be held to have contractual liability but only, if at all, pre-contractual liability, in as much as according to the principles of a "relationship of trust" and "good faith" it was thus required to preserve the interest of the other party by simply carrying out the obligation to require parliamentary ratification"* (Submission n°1, § 101).

58. This line of defense is again contrary to the final findings of the Arbitral Tribunal in the Partial Award. The Arbitral Tribunal has in fact decided that Respondent's liability is based on Article 1358 of the Italian Civil Code and that such provision of the Code entails Respondent's obligation to compensate Claimants' losses (Partial Award, § 169). The Arbitral Tribunal also ruled that such losses have to be assessed pursuant to Article 1223 of the Civil code, according to which the party in breach is liable for the *damnum emergens* as well as for the *lucrum cessans* (Partial Award, § 173). These findings of the Arbitral Tribunal cannot be re-discussed by Respondent.

59. Respondent also submits, in its Post-Hearing submission (§ 10-41), that its liability should be assessed pursuant to Italian administrative law rules, and in particular to the Italian Law n°109/1994 which regulates Italian procurement contracts, and to Presidential Decree n° 554/1999, incorporating in the Code of Public Contracts the legislation relating to contracts entered into by Italian public entities. Respondent thus submits that, pursuant to Article 37 *septies* of Law 109/1994 and Article 134 of the Code of Public Contracts, its liability should be capped to 10% of the contract's price.

60. As correctly pointed out by Claimants, however, these provisions of law are not applicable to the present situation. It is undisputed that said rules are only applicable to the Italian Public Administration. Article 2.7 of the Law 109/1994 is very clear in this respect: such law applies to "*any institution with legal status, set up to satisfy specific needs of general interest and not having an industrial or commercial nature, whose business is financed, for the most part, by the State, by regional administrative bodies, by the autonomous provincial administration of Trento and Bolzano, by local bodies, by other public bodies or by public law institutions, or whose management is subject to the control of those subjects, or whose administrative, managerial or supervisory bodies are constituted as to not less than half by component members designated by such bodies*"[2].

61. Respondent nevertheless submits that the Law 109/1994 would be applicable in virtue of the choice of law made by parties in Article 31 of the Contract's Conditions: "*the parties have agreed, in the event of contractual dispute and arbitration proceedings, to apply Italian substantive law, and it is absolutely clear that in the application of Italian law the Albanian Public Administration must be identified herein as being on an equal footing with and as if it where the Italian Public Administration*" (Post-Hearing brief, § 37).

62. The Arbitral Tribunal disagrees with such position. The choice of law made by the parties in favor of Italian law cannot have the effect of applying to the Albanian State specific administrative law rules which are only applicable to the Italian administration. The referred rules of Italian administrative law provide for a specific regime which derogates from the normal application of the Civil Code in consideration of the public interest at stake in public contracts concluded with the Italian administration. The public interest protected by said legislation is that of the Italian public administration, not of a foreign State.

63. In addition, given the derogatory nature of said administrative law rules, if the parties had intended to refer to Italian administrative law, they would

---

[2] Translation drawn from Claimants' Post-Hearing brief, § 42.

certainly have included a specific reference thereto in the Contract. Quite on the contrary, by agreeing on Italian law instead of the otherwise applicable rules of Albanian law, the parties intended to avoid the application of administrative law and to submit their relationship to general rules of private law. It can therefore not be presumed, absent a specific reference to that effect in the Contract, that they intended to submit to Italian administrative law. The Arbitral Tribunal notes, in this respect, that Respondent never referred to Italian administrative law until after the Partial Award, which is an indication that the reference of Italian law in the Contract was in its understanding a submission to the general Italian legal rules applicable to contracts.

64. As a consequence, the Arbitral Tribunal will say that the reference to *"the substantive law of Italy"* in Article 31 of the Contract's Conditions is to be construed as a submission to the Italian Civil code and not to the specific rules of administrative law applicable to Italian administrative entities.

B) Loss assessment:

65. It is first of all necessary to deal with Respondent's arguments that no loss would have been suffered by Claimants (1), and then address the issues relating to the quantification of Claimants' purported losses (2).

1. Existence of the loss:

66. Respondent submits that Claimants would have *"not sustained any damage for loss of expected financial gain arising from the conditional contract"* (Submission n°1, § 77), the reason for this being that *"the value of such loss (as appears) is less than the saving made as a result of the termination of the contract and therefore of the failure to carry out the contract, and all activities provided therein"* (ibid.). In page 36 of its Submission n°1, Respondent submits that the loss would be *"inexistent, both in relation to the loss of chance (not claimed by the other party) as well as to loss of profit as quantified by the Claimant"*. In its Post-Hearing brief (§ 42), Respondent submits that *"the Claimant failed to comply with the obligation to provide evidence in respect of*

*establishing the existence and quantification of claimed losses or damage"*, as the claim would allegedly be based *"on a theoretical formulation without any objective concrete supporting data"*.

67. It should be recalled that, in its Partial Award (§ 173), the Arbitral Tribunal decided that Respondent's liability is to be assessed pursuant to Article 1223 of the Italian Civil code, and that the compensable loss is to include loss of profit as actual costs. Article 1223 of the Code requires that the loss be a direct consequence of the breach, and Claimants therefore bear the onus of providing evidence both of the existence and amount of their purported loss as well as of the link of causation with the breach.

68. In the instant case, there is no doubt as to the fact that Claimants were entitled to the profits which would have derived from the performance of the Contract. As explained in the Partial Award, Claimants were deprived of said profits by Respondent's unilateral decision not to proceed with the project. It is therefore clear that the losses deriving for Claimants from the non-entry into force of the Contract are a direct consequence of Respondent's breach of the duty of good faith provided by Article 1358 of the Italian Civil code.

69. Respondent's submission that the non-entry into force of the Contract would have entailed no loss whatsoever is in reality equivalent to alleging that the Contract's performance would have generated no profit. Yet there is no evidence whatsoever that the Contract would have been performed at a loss for the contractor. Quite on the contrary, as we shall see hereinafter, Claimants have provided evidence that the performance of the Contract would indeed have generated a profit.

70. The Arbitral Tribunal, as a consequence, concludes that Claimants suffered a loss due to the non-entry into force of the Contract, and that Respondent's breach is the direct cause of such loss. The issue is therefore not whether the non-entry into force of the Contract has generated a loss, but whether Claimants are able to provide sufficient evidence of its amount.

71. From this perspective, the fact that Claimants find themselves in the situation of relying on estimates of the costs that the Contract's performance would have generated does not allow the Arbitral Tribunal to conclude to the inexistence of their losses. The Contract having not entered into force, it is self-evident that the damages have to be assessed on the basis of an estimation of its performance costs which may to a certain degree be hypothetical and uncertain. In the present case like in all situations where future profits have to be estimated, it is impossible to establish the amount of the damages with absolute scientific certainty. Loss of profit is always valued on the basis of estimations. Yet, this is no reason not to award damages when evidence exists that a loss indeed occurred. The situation would certainly have been different had Respondent provided evidence that the Contract would have been performed at a loss, but that is not the case.

72. As a consequence of the foregoing, the Arbitral Tribunal will say that Claimants have established that the non entry into force of the Contract for breach of the obligations imposed upon Respondent by Article 1358 of the Italian Civil code has caused them damage. The following sections of this award will now deal with the amount of the losses.

### 2. Quantification of the purported losses:

73. Claimants seek compensation of actual costs, as well as of loss of profit. The Award shall first deal with the latter (a), the actual costs claim being then rejected as double recovery (b).

### a. Loss of profit:

74. Claimants assessed their loss of profit on the basis of a method consisting in deducting from the Contract's price its likely performance costs. Such method is acceptable.

75. The scope of works of GETS and Athena being different, the loss will be assessed separately for each of the claimants

21

76. The Contract price is detailed in Schedule 1 (the Schedule of Prices). The total price in Euros is € 57,496,569.84, and the total price in Dollars is US$ 12,245,347.71.

77. It is undisputed that, pursuant to the Consortium Agreement dated 15 September 2003 (Exhibit C.2) and the 20 June 2006 Addendum to the Contract (Exhibit C.26), the works have been divided as follows:

- for GETS, the supply of the signaling system (including the traffic control centre), telecommunication system and vehicles (the second-hand passenger coaches and diesel electric locomotives being sub-contracted to GE Transportation Systems USA), representing a share of total price of € 32,552,211.38[3] and US$ 12,245,347.71;

- for Athena, the civil and track works, representing a share of the total price of € 24,944,358.46.

78. Pursuant to Article 16.2 of Schedule 1, the price was to be paid in installments, and the works had to be completed within the time provided in Schedule 3 of the Contract (the Time Schedule). During his 25 February 2008 hearing, M. Silvano Brandi declared that, had the Contract entered into force at the end of 2005, the works would have been performed in 2006, 2007 and part of 2008. The Arbitral Tribunal can therefore assume that the Contract price would have been entirely paid over that period of time. This means that the assessment of Claimants' loss of profit does not imply the discounting of future revenues. In fact, the Arbitral Tribunal notes that Respondent did not ask for any such discounting.

79. As a consequence, the Arbitral Tribunal will assess Claimants' loss of profit on the basis of the Contract price less the estimate of its performance costs.

---

[3] GETS erroneously refers, in Section 9 of its Submission n°1 on the determination of losses, to an amount of € 35,552,221.38. The correct figure is that referred to in Section 28 of the same submission (i.e. € 35,552,211.38).

### aa. GETS's loss of profit:

80. As said above, GETS's scope of work represented a share of total price of € 32,552,211.38 and US$ 12,245,347.71.

81. The variable costs that GETS would have incurred for the performance of its scope of works would, according to the evidence provided by Claimants, have been the following:

- signalling system and automation (including traffic control centre): € 11,546,092 and US$ 1,407,479;

- signalling installation and automation: € 3,221,857;

- telecommunication supplies: € 2,126,306;

- telecommunications installation: € 759,329;

- vehicles: € 1,677,000 and US$ 10,080,000;

- project management: € 975,000.

82. Detailed evidence of each of these items is provided in Exhibits C.49.2 (signaling system), C.49.3 (installation costs), C.49.4 (traffic control centre) and C.49.5 (telecommunications).

83. The total variable costs (the issue of contingencies and fixed costs will be dealt with later) relating to the performance of GETS's share of the Contract was therefore € 20,305,584 and US$ 11,487,479.

84. After deduction of such costs from GETS's share of the Contract price, the profit expectation was therefore € 12,246,627.38 and US$ 757,868.71.

These figures include a € 975.000 contingency deduction (Submission n°1, §
29).

85. Yet, GETS proceeds to a further contingency deduction equal to 5% of
GETS's share of the Contract. GETS accordingly detracts an additional €
1,627,610.59 and US$ 612,267.39 from its profit expectation (Submission n°1,
§ 32), thus bringing its loss of profit down to € 10,619,016.79 and US$
145,601.32.

86. These figures thus represent approximatively 32% of the revenues in Euros
and an overall 25% of GETS's total share of the Contract.

87. GETS's loss assessment corresponds to its pre-contractual profit forecast.
M. Mc Grath confirmed in his testimony that the project's costs were estimated
prior to the Contract's signature in September 2003 (transcript, p. 42). M.
Brandi, at the time CEO of GETS, explained that GETS had solid experience
in the preparation of such cost estimates (transcript, p. 70), which is confirmed
by the detailed check-lists used to that effect (Exhibits C.60 and C.61). There
is also evidence that the estimates were presented in the form of a PowerPoint
presentation during an executive bid review on 18 June 2003 (transcript, p.
141-142 – Exhibit C.56, C.57, C.58 and C.59), and then presented in the form
of two schedules dated 23 July 2003, the first being based on the hypothesis
that GETS would be general contractor for the entire project (Exhibit C.52)
and the second on the basis of GETS as contractor for the entire project less
the track and civil works (Exhibit C.53).

88. The Arbitral Tribunal, having carefully reviewed the supporting
documentation provided by GETS as well as the witness testimonies (in
particular those of M. Paccione, M. Mc Grath and M. Brandi), concludes that
GETS's assessment of variable costs is accurate and properly reflects the costs
that would have been incurred to perform the Contract.

89. The Arbitral Tribunal also notes that a 25% profitability rate is in line with
GETS's performances, as shown by GETS's financial statements. In 2005, the

difference between GETS's costs and production was € 15,054.922 for a total production of € 81,643.783, representing a profit rate of 18% (Exhibit C. 50.2). In 2006, GETS's general profitability had increased to 24.5% (i.e. production costs for € 76 M in respect to a production of over € 100 M -- Exhibit C. 50.3), while the 2007 draft financial statements show a 28% profitability rate (i.e. production costs for € 64 M in respect to a production of € 88 M -- Exhibit C. 50.3). There is, as a consequence, no reason to believe that GETS would not have achieved a 25% profit rate in its performance of the Contract.

90. The Arbitral Tribunal disagrees, in this respect, with Respondent's contention that GETS financial statements would not be admissible as evidence in this arbitration in absence of the auditors' reports (Post-Hearing brief, § 142-156). First, Respondent had the possibility to request the production of said reports in due time, which it did not do. Second, and at any rate, the financial statements only confirm the evidence of GETS losses provided by other means, and are not the sole evidence basing the Arbitral Tribunal's conclusion.

91. As to the contingency, the Arbitral Tribunal considers that the 5% deduction on top of the initial € 975.000 contingency accurately reflects the risks involved by the performance of a large infrastructure project in a country like Albania (Paccione WS, § 16). In this respect, the Arbitral Tribunal is satisfied that the Contract involved a limited level of unforeseen risks. As confirmed by M. Brandi (transcript, p. 79-80), it was a standard project based on mature technology and extensive prior technical investigation. The main unforeseen risks were therefore related to the security of material along the rail lines, in respect to which the company relied on Respondent (transcript, p. 80).

92. As to the impact of direct costs, M. Brandi has confirmed that performance of the Contract would have had no impact on GETS's general fixed costs, as such performance would not have required additional investments to broaden the company's facilities (transcript, p. 122). The Arbitral Tribunal notes, in this respect, that the executive bid review did not contemplate additional permanent investments on top of the variable costs.

93. As a consequence of the foregoing, the Arbitral Tribunal will say that GETS suffered loss of profit in an amount of € 10.619,016.79 and US$ 145,601.32.

### ab. Athena's loss of profit:

94. As said above, Athena's share of the works, relating to the tracks and civil works, is equal to € 24,944,358.46 (i.e € 13,933,038.50 for the track works and € 11,011,319.96 for the civil works).

95. As for GETS, Athena would have received the revenues of the Contract from 2006 to 2008 (assuming the Contract had entered into force late in 2005), so that there is no need of discounting such revenues.

96. Athena's loss of profit is assessed according to the same method as GETS, consisting in detracting costs from revenues. Accordingly, Athena deducts from its share of the revenues the costs it would have faced for the Contract's performance. Such costs have been estimated in a document called "top sheet" dated 1 September 2003 ("the Top-Sheet" – Exhibit C.51-20).

97. The Top-Sheet includes as performance costs a number of different items:

- Mobilization and demobilization: € 380,500;
- Earthworks and structures (except stations): € 2,906,410;
- Civil works in stations: € 2,029,538.36;
- Electromechanical works in stations: € 120,898,82;
- Track works: € 10,342,302;
- Site general expenses: € 240,400;
- Site operational expenses: € 89,600;
- Site administrative expenses: € 1,146,400;
- General use equipment: € 210,000;
- Other expenses: € 444,000;
- Insurance and guarantees: € 548.775.88;

- General Management: € 1,995,548.66;
- Corporate tax: € 873,052.54;
- Financing costs: € 374,165.37;

- Total: € 21,701,591.63.

98. This figure would imply a profit expectation of € 3,242,766.83 representing 13% of the Contract price.

99. The Arbitral Tribunal, having carefully reviewed the evidence produced by Claimants and in the light of the witness testimonies (in particular M. Kallianos' witness statement regarding Athena's scope of work), concludes that such estimate of costs is accurate and properly reflects the costs that would have been incurred to perform the Contract.

100. Yet, the Arbitral Tribunal observes that Athena's estimate of costs includes no contingency deduction.

101. During his hearing, Mr. Kallianos accepted that performance of the Contract involved a certain degree of unforeseen risks in respect to which an allowance would be warranted (transcript, p. 178). The Arbitral Tribunal indeed believes that Athena's loss of profit would be overestimated in absence of a proper risk allowance. Mr. Kallianos declared, in this respect, that he believed that "*10% would be a fair profit for anyone undertaking this project*" (transcripts, p. 177), which means that a 3% contingency should be detracted from the estimated profit.

102. Such a contingency allowance is indeed less than that accepted by GETS for its share of the Contract. Yet, there is nothing in the file to indicate that the risk allowances should be the same for the civil and track works and for the supply of the signaling and telecommunications systems.

103. Having considered all the circumstances of the case, the Arbitral Tribunal is of the view that a 5% risk allowance on Athena's share of the works (i.e. €

1,247,217.92) is accurate and appropriate, and should thus be deducted from Athena's loss of profit claim.

104. As a consequence of the foregoing, the Arbitral Tribunal says that Athena suffered loss of profit in an amount of € 1,995,548.91.

105. The Arbitral Tribunal having determined the amount of the loss of profit, Respondent's request for the appointment of an expert is rejected.

<u>b. Direct costs:</u>

106. Claimants seek, on top of the loss of profit, damages corresponding to *"all costs incurred by Claimants for entering into the Contract with the Respondent and for carrying out the indispensable preliminary activities in relation to the project, including defining the technical aspects of the project, securing the financial capabilities to enable the Respondent to fulfill its payment obligations under the same and launching the project following receipt of the notice to proceed"* (Submission n°1, § 11).

107. The Arbitral Tribunal will reject the claim for direct costs. It should in this respect be recalled that the relevant Italian law principle is that the damages' function is to replace the aggrieved party in the situation that would have prevailed would the other party not have breached its obligations (Cass. 16 June 1969). Claimants are hence not entitled to seek compensation for costs that they would not have been entitled to recoup had the Contract been normally performed.

108. As seen above, the compensation of Claimants' loss of profit has been calculated on the difference between the Contract's price and its performance costs. Such compensation therefore encompasses all amounts that Claimants would have been entitled to receive pursuant to the Contract and all expenses that they would have faced. In order to succeed in their direct costs claim, Claimants should thus prove that they would have been entitled to seek the reimbursement of those costs on top of the Contract price. Yet, no such

evidence has been given. Quite on the contrary, M. McGrath declared during his testimony that the direct costs would not have been recoverable on top of the Contract's price (transcript, p. 43).

109. Claimants submit that their direct cost claim should nevertheless be admitted for those "*incremental expenses deriving from activities undertaken by Claimants to deal with the Respondent's breach*" (Post-Hearing brief, § 64). This statement is in principle correct. Yet, Claimants do not provide any indication as to the costs which would allegedly fall into that category, and limit themselves to submitting that all claimed direct costs "*fall within the ambit of GETS's reasonably recoverable costs in order to put the company back in the position it would have been in the absence of Albania's breach [...] because the project expenses that were not avoided must be recovered in addition to recovering lost profits if the Claimants are to be returned to their "but-for-the-breach" economic position*" (Post-Hearing brief, § 64).

110. The Arbitral Tribunal disagrees with such position. The claimed direct costs have been defined by Claimants as "*all costs incurred by the Claimants for entering into the Contract with the Respondent and carrying out the indispensable preliminary activities in relation to the project, including defining the technical aspects of the project, securing the financial capabilities to enable the Respondent to fulfill its payment obligations under the same and launching the project... Indeed, the main peculiarity of this project was that the Respondent asked the Claimants to prepare all the technical specifications and to conduct all the studies required in order to define the scope of the works under the Contract*" (Submission n°1, § 11). It is therefore clear that the claimed direct costs are negotiation and preparatory costs, not costs derived from Respondent's breach. These are costs that, had the Contract been performed, Claimants would have sustained anyway, and in respect to which Claimants would not have been entitled to compensation other than by receiving the Contract's price. Claimants' claim to direct costs is in reality a claim for an additional remuneration (or for a price increase), which they are not entitled to – or at least do not submit and establish to be entitled to – under the Contract.

### c. Interest and currency appreciation:

111. Claimants seek, in addition to the claimed damages, *"reasonable interest thereon and currency appreciation ("rivalutazione monetaria")"* (Post-Hearing brief, § 75).

112. As to interest, although Claimants may be entitled under Italian law to interest on damages (Torrente Schlesinger, Manuale di Diritto Privato, Giuffré 2007, p. 358), they have the burden of providing evidence that such a claim is justified, as well as of its amount. In the case at hand, the date of accrual of the claimed interest would depend from the exact dates at which the Contract's price installments would have been paid by Respondent had the Contract been performed, as well as from the periods of time during which the Contract's performance costs would have been sustained. Yet, no indication is provided in this respect by Claimants. Likewise, no indication is provided as to the applicable interest rate.

113. The Arbitral Tribunal shall therefore say that Claimants did not prove their request for interest, which shall therefore be rejected.

114. As to the currency appreciation, it is again a claim that supposes evidence by claimant that the payment of interest is insufficient to compensate the delay in the performance of its obligation by the party in breach (Art. 1224 of the Civil code). No indication having been submitted in this respect, the claim will be rejected.

### d. Costs:

115. Claimants seek reimbursement of the costs of the arbitration as well as of its reasonable defense costs.

116. Exercising its discretion under Article 31-1 of the Rules, the Arbitral Tribunal is of the opinion that Claimants are entitled to be compensated for the

costs of the arbitration as well as for their reasonable defense costs. The principle of full compensation would in fact not be served if a succeeding party would be left with the costs it had to support to seek justice.

117. Yet, the Arbitral Tribunal will take into account that Claimants only partially succeeded in their claims. Indeed, Claimants failed in their direct costs claim. While such claim had very limited impact on the amount of the advance of costs paid to the ICC, it has to a certain extent increased the duration and complexity of the arbitration.

118. As a consequence, the Arbitral Tribunal will say that Respondent will support 90% of the costs of the arbitration and 75% of Claimants' reasonable defense costs.

119. In the Terms of Reference and its Submission n°1, Claimants also sought payment of *"reasonable interest"* on the costs of the arbitration and the defense costs. Yet, this request has not been maintained in Claimants' Post-Hearing brief (§ 75). The Arbitral Tribunal shall therefore consider that the claim for interest on the costs of the arbitration and defense costs has been waived.

### da. Costs of the arbitration:

120. Pursuant to Article 31-3 of the Rules, the costs of the arbitration are fixed to US$ 365,000. Such amount has been entirely paid by Claimants.

121. Claimants are therefore entitled to receive US$ 328,500 as costs of the arbitration (US$ € 365,000 X 90%).

122. The VAT paid by Claimants at the request of the Arbitral Tribunal on the fees of the arbitrators will not be considered, as VAT is neutral and its reimbursement may to be sought before the competent tax authorities.

<u>db. Reasonable defense costs:</u>

123. Claimants seek the reimbursement of a total amount of € 276,603.27 as defense costs, in addition to the costs of the arbitration (Post-Hearing brief, § 74).

124. Such amount includes € 145,310 as GETS internal legal advisors, of which no detailed evidence is however provided. Yet, the Arbitral Tribunal believes such amount to be very reasonable for a complex international arbitration having involved almost three years of preparation and work. There is no doubt that such amount if far less than the fees that any international law firm would have charged for outside assistance to Claimants in the case. The Arbitral Tribunal therefore believes that Claimants (like Respondents), by choosing to defend themselves, have contributed to reduce the costs of the arbitration. The Arbitral Tribunal will therefore accept, on the basis of the documents and the submissions produced, the figure submitted by Claimants.

125. The other costs which reimbursement is sought by Claimants are reasonable and justified. They includes fees and expenses of the firms Calabresi-Guadalupi and SLCG, in an amount of € 74,181.86 (VAT not included) and experts' fees and expenses in a total amount of € 59,874.93 (VAT not included), as well as court reporting costs and justified lodging and travel costs.

126. Claimants are therefore entitled to be reimbursed of their justified defense costs in an amount of € 207,452.45 (€ 276,603.27 X 75%).

127. Respondent shall bear its own legal costs.

## **Conclusion**

As a consequence of the foregoing, the Arbitral Tribunal decides that the Republic of Albania shall pay the following amounts to Claimants:

a) € 10,619,016.79 and US$ 145,601.32, being the loss of profit suffered by GETS;

b) € 1,995,548.91, being the loss of profit suffered by Athena;

c) US$ 328,500, as costs of the arbitration;

d) € 207,452.45, as reasonable defense costs.

All other claims are rejected.

Place of the arbitration: Rome

Date: 28 July 208

Prof. Giorgio Bernini                    Naim Isufi

Alexis Mourre